Filed 6/18/14  Certified for publication 7/9/14 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E052088 |
| v. | (Super.Ct.Nos. RIF132760 & RIF148262) |
| ANTHONY M. DEVAUGHN, | |
| Defendant and Appellant. | OPINION |
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056252 |
| v. | (Super.Ct.Nos. RIF132760 & RIF148262) |
| STEPFON MACEY, | |
| Defendant and Appellant. | |
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053067 |
| v. | (Super.Ct.Nos. RIF132760 & RIF148262) |
| MICHAEL OWEN DEVAUGHN, | |
| Defendant and Appellant. | |

1

APPEAL from the Superior Court of Riverside County.  Elisabeth Sichel and Stephen Sillman, Judges.[1]  Affirmed in part; reversed in part; remanded with directions.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant Anthony M. DeVaughn.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Stepfon Macey.

Mary Woodward Wells, under appointment by the Court of Appeal, for Defendant and Appellant Michael DeVaughn.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, James Dutton and Barry J. Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Michael DeVaughn (Michael) of 16 counts of identity theft (Pen. Code, § 530.5, subd. (a)),[2] nine counts of money laundering (§ 186.10, subd. (a)), two of which involved sums greater than $50,000 and less than $150,000 (§ 186.10, subd. (c)(1)(a)), two counts of causing a false financial document to be filed (§ 532a, subd. (1)), four counts of operating an unlicensed escrow agent (Fin. Code, § 17200), three counts of recording a false document (§ 115), six counts of grand theft (§ 487, subd. (a)) and two counts of elder abuse (§ 368, subd. (d))—seven of the latter three crimes

---

[1]  The Honorable Elisabeth Sichel was the sentencing judge for both Michael DeVaughn and Anthony DeVaughn and the Honorable Stephen Sillman was the sentencing judge for Stepfon Macey.

[2]  All further statutory references are to the Penal Code unless otherwise indicated.

involving sums in excess of $150,000 (§ 112022.6, subd. (a)(2)). The jury further found that Michael had committed more than one felony, an element of which was fraud or embezzlement, involving sums in excess of $500,000 (§ 186.11, subd. (a)(2)). The same jury convicted Stepfon Macey (Macey) of two counts each of money laundering and possession of a firearm by an ex-felon (§ 12021, subd. (a)(1)) and one count of possession of ammunition by an ex-felon (§ 12316, subd. (b)(1)).[3] In bifurcated proceedings, the trial court found Macey had suffered four strike priors (§ 667, subds. (c) & (e)(2)(a)), three of which were later stricken. Although all three defendants were tried together, Anthony DeVaughn, Michael's younger brother (Anthony) had a jury different from the one that determined the guilt of Michael and Macey. Anthony's jury convicted him of four counts of money laundering. Michael was sentenced to prison for 33 years, 4 months, Macey to 14 years and Anthony to 3 years, 4 months. They appeal, making various claims, some of which we accept, some of which we reject. We, therefore, affirm some of the convictions, reverse others, reverse an enhancement finding, stay some of the terms imposed, direct the trial court to correct credits awarded to Anthony, to resentence him and Macey and to recalculate Michael's sentence in light of the conclusions drawn in this opinion.

---

[3] The jury hung on charges of possession of cocaine for sale and two counts of possession of a firearm by an ex-felon, and a subsequent jury convicted Macey of simple possession of cocaine (Health & Saf. Code, § 11350) and one of the firearm counts.

3

# FACTS

It would try the patience of any reader to recount all the evidence supporting all the charges of which defendants were convicted. Therefore, enough of the evidence to give the reader a flavor of what occurred follows.

In August 2005, Michael, representing himself to be "Larry Perry" of Fidelity Escrow, leased an office in Riverside. In March 2006, with the rent on the office overdue, Macey, who represented himself as an associate of "Larry Perry's" appeared at the office and brought the rent up to date with cash, after "Larry Perry" said by phone that this was alright.

In the fall of 2005, a woman claiming to be Barbara Karr of Banning, California, contacted a real estate broker in Inglewood, California and asked him to represent her in making an offer on a home in Ontario, California that had been listed for sale. Thereafter, the broker received documents from Fidelity Escrow at the Riverside address identifying it as the escrow holder for the purchase by Barbara Karr, with "Larry Perry" as the escrow officer. After encountering questionable circumstances in connection with the loan,[4] the broker tracked down the real Barbara Karr, who told him that she was not in the process of purchasing the Ontario property. However, this did not occur until after escrow was opened with "Larry Perry" at Fidelity, and the owners of the Ontario property

---

[4] This included discovering a letter suggesting that Barbara Karr, at the Alhambra Lane, Perris property (see below) had attempted to get a loan from a company and had run into problems with credit.

4

had signed a grant deed to Barbara Karr, which their agent sent to Fidelity at its Riverside office in December 2005. The Ontario property sellers filed a quiet title action to protect their right to the property on December 13, 2005. In November 2005, a "Tony Sanchez," at what he said was "Inland Mortgage," at the same address in Riverside as Fidelity, had contacted a mortgage broker about "Barbara Karr" borrowing the money for the purchase of the Ontario property. Documents submitted by "Barbara Karr" in order to obtain the loan had shown her address to be the Alhambra Lane, Perris property[5] and had contained other false information. Although the mortgage broker had found a lender for this transaction, the $275,000 loan had not closed because the mortgage broker had been informed of the quiet title action. Michael later admitted to the case agent that Jackie Marshall, a former business associate of Michael's, had posed as Barbara Karr. When Jackie Marshall had signed the loan documents for the Ontario property, she had identified herself with a California Driver's License that contained the California Driver's License of another person. This person did not know Michael, "Larry Perry," Jackie Marshall or Barbara Karr and did not authorize any of them to use his driver's license number.

The same "Tony Sanchez" who had approached the mortgage broker for the loan on the Ontario property also asked for two loans on property owned by C.L. and Fannie Middleton in Los Angeles. The loan application contained false information and Michael

---

[5] See footnote 4, *infra.*

used his mother and a former neighbor of Macey's, who lived at the Alhambra Lane, Perris property, to pose as the Middletons on December 1, 2005, to sign the loan documents for both loans. Fannie Middleton testified at trial that she did not authorize anyone to take out loans on her properties. Macey's former neighbor used a driver's license bearing the California Driver's License number of a woman who did not know C.L. Middleton, "Larry Perry," Fidelity, any of the defendants, Macey's former neighbor, Michael's mother or Fannie Middleton, and had not authorized any of them to use her driver's license number. The mortgage broker decided not to fund a loan on the Middleton's 43rd Street, Los Angeles, rental, but did fund a $161,000 loan on their 46th Street, Los Angeles, home. According to the escrow instruction, the loan proceeds were to be wired to an account at Washington Mutual Bank, ending in 701, which belonged to "Larry Perry" doing business as Fidelity Escrow. This wire transfer was the first activity in this account, which had been opened on November 3, 2005. Subsequently, on December 14th, 15th and 19th, checks were written on this account to Deals Market in South Carolina for $30,000, a market owned and operated by Michael and Anthony, to A Squared Management for $10,000, which Anthony later admitted he owned and was a "shell company," to Hi-Tek-N-Effect for $10,000, to Macey and to Fannie Holloway, the niece of Fannie Middleton. There was no activity in this account after February 6, 2006. The people who had funded this loan eventually were reimbursed by the title insurance company. Michael admitted to the case agent that he had orchestrated the successful loan. No funds from this loan, however, went to either of the Middletons.

6

In 2006, "Inland Mortage" contacted Crawford Investments, a hard money lender about a $210,000 loan by the Middletons on their 43rd street rental property. On February 8, 2006, Michael's mother and Macey's former neighbor, posing as the Middletons, signed the loan documents and the deed of trust. The name and license number of a female real estate agent, purported to be representing "Inland" but was, in fact, unconnected with the transaction, was placed on the brokers' agreement between "Inland" and her signature was forged on it. The loan closed on March 16, 2006. The title company eventually reimbursed Crawford for the loan. Of the loan proceeds, $153,618.79 was wired to Fidelity per the instructions of "the Middletons" to Fidelity. The account into which the money was wired at Washington Mutual, ending in 296, had been opened by "Larry Perry doing business as Fidelity Escrow" on March 14, 2006, using the California Driver's License number of an Orange County school teacher. On March 16 and 17, 2006, two checks, each for $60,000, made out to Larry Perry from this account, were cashed. Cashier's checks totaling almost $50,000 were also given to Macey's business.

The evidence concerning the transactions dealing with the Alhambra Lane, Perris property is conflicting and confusing and need not be recounted here, except to say that it was similar to what had occurred with the Ontario property and the Middletons' properties.

Michael unsuccessfully approached an acquaintance that lived in Alabama about going into business with him. Eventually, Michael's business associate in Alabama put

Michael in touch with his nephew's girlfriend, Felisha Poole. Through his business associate in Alabama, Michael directed Felisha, in June 2006, to get a business license and set up three bank accounts at three different banks in the area for three different entities. The name of one of the companies was identical to the name of a legitimate company in California that serviced loans. Poole was told that she would get $500 every time she took money out of these accounts. Proceeds from loans on the Alhambra Lane, Perris property, totaling $85,342 and $334,538 were deposited into one of these accounts. A check was written to Deal's Market on that account, as were checks for $7,880 and $72,000 (made out to cash), in addition to cash withdrawals totaling $42,000, all during June 2006. Cashier's checks in five figure amounts were made out in June 2006, to Michael and to various entities established and controlled by Anthony and Macey from the money withdrawn from this account. Similar transactions took place in the other two accounts.

More facts will be disclosed in connection with the issues discussed below.

### ISSUES AND DISCUSSION

1. *Insufficiency of the Evidence*

    a. *Count 33*

    1. *Source of Funds for Instrument and Intent When Instrument was Negotiated*

Michael and Anthony contend that there is insufficient evidence to support their convictions for money laundering under count 33, which involves a check written on Fidelity Escrow's Washington Mutual Account, ending in 296, made out to A Squared

8

Management Corp., which Anthony deposited into the account of A Squared Management on April 20, 2006, but which deposit was reversed at the direction of the bank's investigator, because the evidence was insufficient to support a finding of the requisite source of the funds or the intent when the check was negotiated. However, because the People concede that this check was not a "monetary instrument" within the meaning of section 186.9, subdivision (d) (see below), as required by the prohibition on money laundering (§ 186.10, subd. (a)), and, therefore, we must reverse the convictions for this count, we need not address this issue.

2. *"Monetary Instrument"*

Section 186.10 prohibits the conducting or attempting to conduct a transaction "involving a monetary instrument" with a particular specific intent or knowledge. Section 186.9, subdivision (d) excludes from the definition of a "monetary instrument" "personal checks which have been endorsed by the named party and deposited by the named party into the named party's account with a financial institution." The People concede that the above-mentioned check was a personal check which was "deposited by the payee into the payee's bank account." Therefore, Michael's and Anthony's convictions for this count must be reversed.[6]

---

[6] Because of this, we need not address defendants' contention that their convictions of this count must be reversed for jury instruction error, nor Anthony's argument that count 18 must be reversed for insufficiency of the evidence on another basis.

9

b. *Counts 18, 19 and 20*

For the same reason as explained above, the People concede that Michael's convictions for money laundering as to counts 18, 19 and 20, Anthony's for counts 18 and 19 and Macey's for count 20 must be reversed. All three involved personal checks written on the Washington Mutual account of Larry Perry, DBA Fidelity Escrow Company, ending in 701, made out to Deal's Market, A Squared Management and Hi-Tek-N-Effect, respectively, which were endorsed for deposit into the bank accounts for each entity.[7]

c. *Count 21*

Section 186.9, subdivision (d) also excludes from the definition of "monetary instrument" "any personal check made payable to the order of a named party which have *not* been endorsed . . . ." Count 21 involved two checks made out to Macey from Fidelity Escrow's Washington Mutual Account, ending in 701, totaling $6,500, both of which were endorsed by Macey, then by a liquor store and deposited into its account. The People concede that Michael's and Macey's conviction for this count must be reversed.

d. *Counts 44 and 45*

1. *Michael*

The Second Amended Information charged, as to count 44, that Michael and Anthony committed money laundering in that "on or about June 22, 2006, in the County

---

[7] Because of this, we need not address defendants' contention that their convictions of these counts must be reversed for jury instruction error.

10

of Riverside, [t]he[y] did . . . conduct a transaction . . . , to wit: Wachovia Check . . . [ending in] 3546 to the order of 'A' Squared Mgmt. for . . . $20,799.40 . . . " As to count 45, the same document stated that Michael committed money laundering, "on or about June 22, 2006 in the County of Riverside . . . [by] conduct[ing] a transaction . . . to wit: Wachovia Check . . . [ending in] 3547 to the order of Hi-Tek Enterprises for . . . $30,022.76 . . . ." During her testimony, Felisha Poole stated that she opened an account at Wachovia Bank in Alabama for American Services Company, depositing into it the $85,342 and $334,538 checks written to that company for the loan on the Alhambra Lane, Perris property. She testified that during June, she made withdrawals from this account for, inter alia, $8,500, $10,000, $5,000, and $28,500 and she obtained cashier's checks based on the money that was withdrawn. She also testified that she "did" cashier's checks to A Squared Management on June 22, 2006 for $20,799.40 from American Service Company and one to Hi-Tek Enterprises with American Service Company as the "remitter" on June 22, 2006, for $30,022.76, the latter of which was endorsed by Macey, Hi-Tek Enterprises. She admitted that she took a lot of cash out of the Wachovia account, and with that cash she obtained a lot of cashier's checks. Macey testified that the check made out to Hi-Tek Enterprises was from Michael for Macey, for Michael and an investor from Syria to open a car wash, however, payment was stopped on the check and it was eventually found by the police in the Riverwalk

11

home (discussed *infra*).  Copies of the front and back of these checks were admitted into evidence.[8]  The back of the cashier's check made out to A Squared Management bears the endorsement, "Pay to the Order of Bank of America[,] Los Angeles, . . . For Deposit Only[,] A Squared Management" followed by an account number.  It had been negotiated.  The check made out to Hi-Tek Enterprises had been endorsed by Macey, with the words "Hi Tek Enterprises" printed below his signature, the account number for his Bancomer account below that and it had also been negotiated.  On a copy of the same check, which had been found at the Riverwalk house, were stamped the words, "Payment stopped."  A check on Macey's Bancomer account showed that that account was located at a branch of Bancomer located in Perris, California.

The jury was instructed that in order for the defendants to be guilty of money laundering, they had to conduct a financial transaction at "any national bank or banking institution located or doing business in the State of California."

During opening argument to the jury, the prosecutor said of count 44, "[W]e're talking about the Robert Peters' loan and the proceeds from the WMC Stewart Title File. . . . I've . . . taken the A[merican] S[ervice] C[ompany] account and put on the side the different counts and checks that you can point to. . . .  [¶]  . . . [¶]  . . . Count 44 is

---

[8]  Although he cites to portions of the record that did not take place in the presence of the jury, at side bars, the trial court noted that the check made out to A Squared Management bore clearinghouse stamps stating that it had been deposited into the Bank of America in Los Angeles and Macey's Bankcomer Bank account was located in Perris, California.

Michael and Anthony regarding A-Squared Management check for [$]20,749.40. . . . Count 45 is Michael . . . regarding a check to Hi-Tek Enterprises for $30,000.22.[9]  That same check is found in . . . Macey's home at . . . Riverwalk with a stamp over it, stop payment or payment stopped."  However, during closing argument, the prosecutor said of the money laundering charges, "If we could develop a trail of financial institutions *all in California*, we could have charged [Anthony] for every deposit, withdrawal, deposit, withdrawal. . . .  It doesn't matter if you get to keep it."  As to the money laundering charged in Count 18, the prosecutor said, " . . . I showed you . . . Exhibit 112.  It is a withdrawal out of a bank, Washington Mutual, *located in the State of California. . . .* [¶]  . . . Count 18 will show a check written out of Deal's Market out of Washing[ton] Mutual, *the* [*S*]*tate of California*."  The prosecutor then turned to counts 44 and 45, and said, "[I]f you look at the bank statement [for American Service Corporation at Wachovia Bank] you'll see that the only money that came in to here is the money they got from Stewart Title from the Robert Peters transaction.  Every check written out here that Felisha Poole wrote . . . came out of that account from ill-gotten gains.  [¶]  [The first check was] written to Deal's Market.  And it is out of Wachovia.  And we did not introduce any evidence.  I believe the evidence would have shown Wachovia doesn't do business in the State of California at that time, but that wasn't presented.  So we had to think of something a little bit more creative to explain that it actually came out of the

---

**9** See footnote 4, *ante*, page 4.

13

State of California, because we have to meet those elements.  [¶]  . . .  [¶]

 . . . [T]his . . . check, . . . which goes to Count 44, this one goes to A-Squared Management. . . .  Same issue about Wachovia, whether Wachovia was a bank in the State of California.  What you have to do is make sure that some part of the transaction actually occurred in the State of California.  That is what gives us jurisdiction.  [¶]  So fortunately for us the stamp shows pay to the order of Bank of America, Los Angeles, California, for deposit only, A-Squared Management.  And that is all we need to know.  [¶]  Count 45 has to do with Hi-Tek.”

Michael here asserts that the jury was presented with alternative factual bases for his guilt of both counts, one of which was legally inadequate.  Specifically, he contends that the jury could have convicted him of counts 44 and 45 on the basis of Felisha Poole’s purchase of the cashier’s checks at Wachovia Bank or on the deposit of those checks into accounts at California banks.  The problem with the first theory is that, as the jury here was instructed, the financial institution involved must do business in the State of California (§ 186.9, subd. (b)) and there was no evidence that Wachovia did business in California.

The People assert that because the jury was instructed that the financial institution must do business in California, in order to convict Michael of these counts, it necessarily based its verdicts on the depositing of these checks into Anthony’s and Macey’s California banks.  Indeed, in his closing argument to the jury, the prosecutor specifically addressed the necessity of the jury finding that the transaction took place at a bank in

14

California and he suggested that depositing the checks, which are the subject of these counts, into accounts at California banks fulfilled that requirement. Therefore, we reject Michael's contention that the jury could have based its verdicts for these counts on the obtaining of the cashier's checks by Felisha Poole at Wachovia Bank.

2. *Anthony*

Anthony asserts that there is insufficient evidence that he was involved in the depositing of the cashier's check into A Squared's Bank of America account, therefore, his conviction of count 44 must be reversed. We disagree.

Michael's business associate in Alabama testified that Michael called him and told him that he would be receiving a package from Felisha Poole, which the man was to mail to Deal's Market, which he did. He also testified that Anthony ran Deal's Market. Felisha Poole testified that she gave the cashier's checks she purchased, including the one made out to A Squared Management, to the above-mentioned business associate. Anthony told the case agent that he owned A Squared Management and it was a shell company. A copy of the articles of incorporation for A Squared were introduced into evidence. A document dated May 11, 2005, shows Anthony to be the director and the articles list a B. Moon. In an interview with the case agent, Anthony admitted receiving stolen money from Michael He admitted that he purchased Deals Market and other retail stores in the same vicinity for $175,000, which money came from A Squared Management. He told the case agent that he formed A Squared Management, that it was supposed to be a holding company or a parent company and it owned other businesses of

15

his, but that it was fake. He also admitted pumping "quite a bit of money" through A Squared and moving stolen money for Michael. At trial, Anthony admitted starting A Squared Management and incorporating it. He said he was the Chief Financial Officer, he owned all its shares and the bulk of its income came from Michael. On the stand, Anthony first refused to disclose any information about B. Moon, then denied having any information about him. Anthony admitted opening bank accounts at Washington Mutual for A Squared Management, for which he was the signatory. One of the accounts received, in its first month, electronic deposits totaling $250,000, from Michael, using the name "Ron Bartlett" at "Inner City Escrow" and $60,000 the following month, and two electronic transfers of a total of $105,000 were made into the other. In April 2006, he received a check for $31,900 made out to A Squared Management from Larry Perry at Fidelilty Escrow. He admitted that A Squared was "the funneling agent" for these monies. Anthony testified that "he had" four bank accounts for A Squared—including one at Bank of America. He said that when he received money from his customer, Brittany Spears, "[s]ometimes I had it go into both" "[the bank account of] A Squared Management or . . . [another of his companies]." No one other than Anthony was mentioned by any witness as having a connection with A Squared or conducting any of its banking business.

The foregoing constitutes sufficient evidence that Anthony either personally deposited the check into A Squared's Bank of America account or directed the deposit.

e. *Enhancement on Count 27*

Count 27, a conviction against Michael for recording a false or forged document, pursuant to section 115, was based on the recording of the deed of trust for the loan taken out by people posing as the Middletons at Crawford for the 43rd Street rental property. Employees of Crawford testified that people posing as the Middletons signed a deed of trust on the property and the amount of the loan was $210,000, with the funds being provided by Arrowhead Servicing Company, an interim funder, also owned by the owner of Crawford. The deed of trust was signed on February 8, 2006 and filed on March 16, 2006. Of the $210,000, $153,618.79 went to Fidelity Escrow, $14,280 went to Crawford for broker's fees and $3,570 to Inland Mortgage for its commission for bringing the loan to Crawford.

At the time he committed count 27, section 12022.6, subdivision (a)(2) provided that when a person "takes, damages or destroys any property in the commission or attempted commission of a felony, with the intent to cause that taking, damage or destruction, . . . [¶] . . . [¶] [i]f the loss exceeds $150,000," the court shall impose a term of two years consecutive to the term for the offense. Section 115 punishes, in pertinent part, anyone who "knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within the state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state . . . ." Subdivision (c) of section 115 prohibits the granting of probation, except in unusual cases where the interests of justice would best be served if probation was granted, for, inter

17

alia, anyone convicted of more than one violation of the section in a single proceeding, with the intent to defraud another and where "the violations resulted in a cumulative financial loss exceeding one hundred thousand dollars . . . ."

Michael here concedes that there is no authority declaring that a section 12022.6 enhancement is inapplicable to a violation of section 115. However, he asserts that it has been held inapplicable to filing a false income tax return, citing *People v. Frederick* (2006) 142 Cal.App.4th 400 (*Frederick*). In so doing, he overstates the holding in *Frederick*. Therein, evidence established that the defendants defrauded many individual and business victims as part of their "elaborate chain scheme" which included securities fraud. Additionally, there was evidence that they owed $195,697 in income taxes based on "assumed illegal and unreported activities" and, based on that, they were convicted of filing a false income tax return. (*Id*. at pp. 404-405, 408.) An enhancement was found true in connection with this conviction, pursuant to section 12022.6, subdivision (a)(4), which applied when, "any person takes, damages, or destroys any property in the commission . . . of a felony . . . [i]f the loss exceeds . . . $2,500,000 . . . ." Subdivision (b) of section 12022.6 provides, "In any accusatory pleading involving multiple charges of taking, damage, or destruction, the additional terms provided in this section may be imposed if the aggregate losses to the victims from all felonies exceed the amounts specified in this section and *arise from a common scheme or plan*." (Italics added.) The appellate court concluded, " . . . [T]he crime of filing a false income tax return is not part of a common scheme or plan to take property within the meaning of section 12022.6,

18

subdivision (b).  The common scheme or plan here involved completed acts of theft and fraud against thousands of . . . [individual and business victims] . . . .  The [defendants'] filing of a false income tax return was a separate act occurring at a different time against a different victim.  The plain language of the statute does not permit application of the taking enhancement here . . . ."  (*Frederick*, *supra*, 142 Cal.App.4th at p. 423.)  Thus, rather than holding that the great loss enhancement does not apply to the failure to file a tax refund, resulting in the loss to the state, *Frederick* held that the loss to the state occurred at a different time than the losses to the individual and business victims, involved a different victim and was separate from the scheme to defraud the individual and business victims, and, therefore, could not be considered part of the scheme or plan to defraud the latter.

Michael's argument that since section 115 is obviously aimed at preserving the integrity of recorded documents, any loss occasioned by that cannot be considered a loss under section 12022.6 is undermined by subdivision (c) of section 115 as set forth above.

2. *Multiple Convictions of Operating an Unlicensed Escrow Agent*

Financial Code section 17200 provides, "It shall be unlawful for any person to engage in business as an escrow agent . . . except by means of a corporation duly organized for that purpose licensed by the commissioner as an escrow agent."

The People asserted that Michael had committed three violations of this section. The first, count 12, was in connection with "the Middletons" obtaining a loan from VIP for the 46th Street home in December 2005, during which Fidelity sent wiring

19

instructions to VIP to send the loan proceeds to Fidelity's bank account. The second, count 29, was in connection with "the Middletons" obtaining a loan from Crawford on the 43rd Street rental property, during which Fidelity sent wiring instructions to Crawford to send the loan proceeds to Fidelity's bank accounts. This occurred in February and March 2006. The third, count 38, occurred when Anna Smith gave Fidelity $2500, believing that Fidelity was acting as her escrow agency in her purchase of a home in Victorville. This occurred in 2006. The jury convicted Michael of all three counts.

Michael here seeks reversal of two of these three convictions, asserting that the offense of engaging in business as an escrow agent by means of a corporation that is not licensed by the commissioner as an escrow agent is a continuous course of conduct which may not be splintered into discrete offenses, based on acts that occur on different dates, involving different transactions.

As Michael asserts, we look to the language of Financial Code section 17200, giving its words their usual and ordinary meaning. (*People v. Trevino* (2001) 26 Cal.4th 237, 240.) If the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the objects to be achieved by the legislation, the evils to be remedied, the legislative history, public policy and statutory scheme of which it is a part. (*People v. Flores* (2003) 30 Cal.4th 1059, 1063.)

Turning first to the language of Financial Code section 17200 itself, Michael asserts that "engag[ing] in business" in the section implies "activity of a continuous and frequent nature." In so doing, Michael contrasts "engaging in business" with "a single or

occasional disconnected act" (*Advance Transformer Co. v. Superior Court* (1974) 44 Cal.App.3d 127, 135), which, he asserts, does not constitute engaging in business. However, as the People correctly point out, Michael does not contest his guilt of violating Financial Code section 17200 when Realty Service Escrow acted as escrow agent in the purchase of the Alhambra Lane, Perris property, which concluded on June 7, 2006.

Turning to extrinsic considerations, Michael finds support for his position in *Escrow Institute of California v. Pierno* (1972) 24 Cal.App.3d 361, 366, 368. Therein, independent escrow agents contended, inter alia, that Financial Code section 17200's requirement that they must be a corporation was unfair or unreasonable. (*Pierno* at p. 365.) The appellate court responded, "[C]onsideration is to be given to the fact that an independent escrow agent may be handling numerous escrows involving substantial sums of money and in various stages of progress. If an individual person is operating such a business, his death could give rise to substantial complications and delays in the consummation of the transactions involved. As stated in *County of L.A. v. Southern Cal Tel. Co* (1948) 32 Cal.2d 378, at pages 390-391 . . . : 'Corporations . . . are more easily regulated and supervised, and they have much greater permanency of existence and can give better assurance of uninterrupted service.'" (*Id*. at p. 368.) We find no clue in this language that Financial Code section 17200 was intended to prohibit only the on-going operation of an unlicensed escrow agency, rather than its discrete acts.

Continuing with extrinsic considerations, Michael also calls our attention to Financial Code section 17414, which prohibits anyone subject to the provisions of

21

Financial Code section 17200 et seq. from engaging in individual acts that violate escrow instructions, constitute theft, fraud, misrepresentations or omissions of material fact or misappropriate money.[10] He argues that Financial Code section 17414's focus on discrete acts somehow suggests that Financial Code section 17200's prohibition on engaging in business as an escrow agent should be construed as a continuing course of conduct. However, we are persuaded by the People's argument that Financial Code section 17414 punishes certain discrete acts performed even by a licensed escrow agent. This in no way suggests that the crime of engaging in business as an escrow agent except through a corporation licensed as an escrow agent cannot occur each time an act which constitutes engaging in business as an escrow agent is committed and the corporation has no license. Unlike Michael, we detect no conflict in interpreting Financial Code section 17200 as applying to any instance in which one commits an act that constitutes engaging in the business of an escrow agent in the absence of a licensed corporation and acts

---

[10] Financial Code section 17414 provides in pertinent part, "(a) It is a violation for any person subject to this division or any director, stockholder, trustee, officer, agent, or employee of any such person to do any of the following: [¶] (1) Knowingly or recklessly disburse or cause the disbursal of escrow funds otherwise than in accordance with escrow instructions, or knowingly or recklessly to direct, participate in, or aid or abet in a material way, any activity which constitutes theft or fraud in connection with any escrow transaction. [¶] (2) Knowingly or recklessly make or cause to be made any misstatement or omission to state a material fact, orally or in writing, in escrow books, accounts, files, reports, exhibits, statements or any other document pertaining to an escrow or escrow affairs. [¶] (b) Any director, officer, stockholder, trustee, employee, or agent of an escrow agent, who abstracts or willfully misappropriates money, funds, trust obligations or property deposited with an escrow agent, is guilty of a felony."

22

committed that constitute a violation of escrow instructions, theft, fraud, misrepresentation or omission of material fact or misappropriation of money.[11]

Michael fails to persuade us that he can stand convicted of only one count of violating Financial Code section 17200 in connection with Fidelity Escrow.

3. *Section 12022.6, subdivision (a)(2) Finding as to Count 10*

Michael and the People agree that the jury failed to make a finding as to the section 12022.6, subdivision (a)(2) enhancement allegation attached to count 10. Therefore, its term, which was stayed pursuant to section 654, must be stricken.

4. *Incompetency of Anthony's Trial Counsel*

Although all three defendants were jointly tried, Anthony's guilt was determined by one jury while Michael's and Macey's were determined by another. The case agent for the search of what the prosecution alleged was Macey's home on Riverwalk in Perris testified to finding not only many documents that tied Macey, Michael and Anthony together, to these crimes and to other individuals involved in these crimes, but four handguns and a rifle, most of which contained ammunition and all of which appeared to the case agent to be operable, loose ammunition, suspected cocaine in a lady's shoe in the master bedroom closet and in a woman's purse hanging from a closet off the master

---

[11] In his reply brief, Michael points also to Financial Code section 17403, which prohibits anyone subject to Financial Code section 17200 et seq. from representing that he/she is in the escrow business when the person is not licensed. As with Financial Code section 17414, this punishment of discrete acts does not suggest that Financial Code section 17200 cannot punish discrete acts of engaging in the business of an escrow agent in the absence of a licensed corporation.

23

bedroom and three scales, one containing white residue. A criminalist testified that the suspected contraband was 26.07 grams and 0.51 grams of cocaine. A narcotics detective testified that the amount of cocaine found, the scales and the guns suggested that the drugs were being sold. Macey testified for himself, denying that he lived at the Riverwalk house, but admitting that he visited there once or twice a month because his estranged wife lived there. He denied any knowledge of the drugs, the guns and some of the ammunition. Interestingly, he said that Anthony occupied an upstairs bedroom at the house. Anthony similarly testified for himself and admitted telling the police that he moved stolen money around for Michael. As already stated, Anthony admitted forming a number of corporations, none of which appeared to be engaged in any substantial business, and he was very defensive on the stand about his refusal to disclose basic information about his main corporation. He admitted that he opened a bank account for his main corporation that in less than a month's time received deposits of $150,000, $50,000 and $55,000, but he was unable to satisfactorily tie these profits to legitimate business, other than to say that the latter two came from another account he had opened the same month for the same corporation. That latter account had a deposit of $250,000, the bulk of which Anthony admitted came from Michael. He also admitted that a strip mall he and Michael owned in South Carolina was purchased with money Michael illegally obtained doing real estate transactions. At Michael's direction, Anthony sent $4,500 to Macey. During an interview with the case agent, Anthony admitted receiving money from Michael, knowing that Michael was not making the money he gave Anthony

24

legitimately because Michael had just gotten out of prison and had no job. He admitted several times to receiving stolen money or moving stolen money for Michael. He also admitted that his main corporation was a fake. He demonstrated knowledge of all the different entities Michael set up and revealed that he, himself, had an additional case pending in Los Angeles County. It also was revealed during the interview that everyone else involved in these schemes had extensive criminal records. It is remarkable that in the interview, although Anthony admitted that he moved money that was stolen; he expressed not a pittance of remorse or concern for any of the victims of the thefts. Rather, he expressed sorrow only that he had been caught and that he had not personally received more of the ill-gotten money than he claimed he actually did. He was flippant and acted entitled.

We will bypass Anthony's argument that had his counsel objected to his jury hearing evidence related to the guns, ammunition and drugs found at the Riverwalk house, he would have been successful in preventing his jury from hearing this evidence. We turn to the ultimate question, assuming, for the sake of this argument only, that Anthony's counsel was ineffective in not preventing his jury from hearing this evidence, and we examine the prejudice resulting from this failure. Anthony carries the heavy burden of demonstrating a reasonable probability that he would have enjoyed a better outcome had his jury not heard this evidence. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 689.)

25

We have read the entire transcript of this very lengthy trial, most of which was devoted to the offenses that did not involve drugs, ammunition or guns. Frankly, the truly shocking and highly inflammatory evidence adduced at trial related to the financial/fraud offenses. The notion that someone could randomly pull some innocent person's driver's license number out of thin air, put it on a loan application and end up walking away with hundreds of thousands of dollars, while encumbering yet another innocent person's property and "ripping off" lenders and title insurance companies far outweighs evidence about a codefendant possibly having a stash of guns, ammunition and drugs. Added to this is shock value of the effort that Michael went through to launder his ill-gotten gains—the use of Felisha Poole, who was barely literate, but who, at Michael's direction, funneled hundreds of thousands of dollars through accounts he had her set up. As the sentencing court observed, Michael, who proved himself pre-trial and at trial to be a very intelligent self-represented defendant, would have been better off going to law school and using his obvious intellectual gifts to earn money legitimately rather than what he did. The jury heard Anthony's interview with the case agent and the ease with which he admitted knowing that the astronomical sums of money he "handled" for his brother had not been legitimately obtained, without expressing any concern for the people who had been harmed or inconvenienced by what Michael did, which Anthony assisted by "moving" the money around. This was truly outrageous and far outpaced the almost inconsequential, by comparison, evidence about Macey's guns, ammunition and drugs. We add that the other jury was apparently so unconvinced by the evidence concerning

26

these latter crimes that it hung as to the drug possession for sale charge and two of the gun possession charges. As the People correctly point out in their brief, there was also a dearth of evidence, aside from the comparatively insubstantial amounts of money Michael directed his brother to send to Macey, linking Anthony and Macey, thus, any suggestion that Anthony, or even Michael, for that matter, was somehow involved in any drug-or gun-aspect of this case is absurd. In fact, evidence adduced at trial about Macey's obtaining government assistance under highly questionable circumstances, and obtaining money for his estranged wife to "care take" of him while she lived many miles away from where he claimed to live, demonstrated that Macey, the twice-convicted robber, had his fingers in a number of illegal pies, in addition to Michael's schemes. In fact, Macey's use of government entitlements made what was found at the Riverwalk house seem like small potatoes. Additionally, surely it could not have escaped the jury's attention that the mother of Anthony and Michael, even in the sunset of her life, apparently willingly participated in Michael's far-flung effort to steal from a number of persons and entities. Whether each juror was a fan of the nature or nurture theory of child development, it would not have taken a leap of logic to see that the apple hadn't fallen far from the tree. Given this record, Anthony cannot possibly persuade us that there was even a remote possibility that he would not have been convicted of the four counts of money laundering, three of which we reverse in this appeal, had the evidence at issue not been heard by his jury.

27

5. *Sentencing*

 a. *Michael*

In connection with the obtaining of the loan from VIP for the Middleton's 46th Street home, the jury convicted Michael of one count each of identity theft for Macey's former neighbor's use of a woman's California driver's license number on an identification he presented to VIP when he signed for the loan (count 5), Michael's mother's use of a man's California driver's license number on an identification she presented to VIP when she signed for the loan (count 6), Macey's former neighbor representing himself to be C.L. Middleton when he went to the mortgage broker (count 7) and Michael's mother representing herself to be Fannie Middleton when she went to the mortgage broker (count 8). The sentencing court imposed terms concurrent to count 9, the principal term, for counts 5, 6, 8 and stayed the term for count 7 pursuant to section 654. The terms for the conviction for elder abuse, for forging C.L. Middleton's name on the deed of trust and the promissory note in order to obtain the loan from the mortgage broker on the 46th Street home (count 9), was designated as the principal term, and the terms for recording a false or fraudulent document, which was the trust deed on that home (count 10), and for grand theft, by having Macey's former neighbor and Michael's mother identify themselves as C.L. and Fannie Middleton to obtain that loan, thereby injuring the investors who funded that loan (count 11), were run consecutive to the term for count 9. The term for operating an unlicensed escrow agency, which was based on

28

Michael running Fidelity Escrow during the mortgage broker's loan on the Middleton's 46th Street home (count 12) was run concurrently with the term for count 9.

Michael here contends that the concurrent terms imposed for counts 5, 6, 8 and 12 and the consecutive term for count 11 should be stayed pursuant to section 654 because they were all part of an indivisible course of conduct to further his plan to fraudulently obtain money from the Middleton's property. Michael made the same argument below. The sentencing court observed that counts 5, 6 and 8 involved different victims than count 9, therefore section 654 was inapplicable. The court added, " . . . I can have more than one objective for a crime. I can have an overall plan or scheme to defraud a title company out of some money, but in order to put that into effect, I have to commit smaller crimes with other victims, like identity theft, and I don't think the law is intending or telling us that you can't be punished separately for those. . . . [¶] . . . [I]t is in a sense part of an overall crime, but you have lesser objectives along the way in committing those crimes. Your objective there was to commit identity theft and then use that stolen identity to commit the fraud. But you still had another . . . goal in mind, which was identity theft." The court also observed, "[I]n deciding whether it's part of one continuous transaction or not [one must ask, 'D]id it happen close in time or did it happen with sufficient separation so that a defendant has the ability to pause and reflect about his actions[?'] [¶] Another exception is it can be one transaction, but when you have different victims, it's not subject to 654." In later imposing sentence on count 8, the court reversed its original ruling that section 654 applied when it was pointed out that

29

count 8 involved Fannie Middleton, a separate victim from the victim of count 9, C.L. Middleton. The sentencing court also concluded that counts 5 and 6 were separate crimes from count 9, but were related to that count.

Under section 654, "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision . . . ." The statute thus prohibits punishment for two crimes arising from a single, indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208 (*Latimer*).)

Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the actor. (*Latimer*, *supra*, 5 Cal.4th at p. 1208.) If all the offenses are incidental to one objective, the defendant may be punished for any one of them, but not for more than one. (*Ibid*.) On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives, which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or where part of an otherwise indivisible course of conduct. (*People v. Centers* (1999) 73 Cal.App.4th 84, 98 [Fourth Dist., Div. Two].)

The question of whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) Its findings

30

on this question must be upheld on appeal if there is any substantial evidence to support them.  (*Ibid.*)  "'We must "view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]"  [Citation.]'  [Citation.]"  (*Id.* at pp. 1312-1313.)

"'Under section 654, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment.  [Citations.]"  [Citations.]  This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.  [Citation.]'  [Citations.]"  (*People v. Andra* (2007) 156 Cal.App.4th 638, 640 (*Andra*).)

In connection with his argument as to other counts, Michael asserts that although section 654 does not prohibit punishing crimes involving separate victims of *violence*, it applies if the crimes are against property interests, citing *People v. Beamon* (1973) 8 Cal.3d 625 and 638, footnote 10 and *People v. Bauer* (1969) 1 Cal.3d 368, 378 (*Bauer*). *Beamon*, in a footnote, merely cites *Bauer* for the proposition that "where a course of conduct involves only crimes against property interests of multiple victims, common sense requires, in the absence of other circumstances, a determination of the indivisibility of the course of conduct and the applicability of section 654." (*Beamon*, *supra*, 8 Cal.3d at p. 625, fn. 10.)  *Bauer* involved punishment for a single conviction of robbery, even

though three different victims were held up at the same time and place, along with punishment for auto theft, which resulted when, during the robbery, defendant also stole a car of one of the three victims. (*Bauer*, *supra*, 1 Cal.3d at p. 372.) The California Supreme Court observed that the intent to steal the car was formed while items from a home were being taken. (*Id*. at p. 377.) Another appellate court later observed that the car was taken to facilitate the taking of the items from the home and to leave the scene with the stolen goods. (*People v. Lopez* (2011) 198 Cal.App.4th 698, 718 (*Lopez*).) The California Supreme Court in *Bauer* concluded, "[T]he taking of several items during the course of a robbery may not be used to furnish the basis of separate sentences. . . . [W]here a defendant robs his victim in one continuous transaction of several items of property, punishment for robbery on the basis of the taking of one of the items and other crimes on the basis of the taking of other items is not permissible. [¶] . . . [¶] Where . . . the offenses arising out of the same transaction . . . involve crimes against property interests of several persons, this court has recognized that only single punishment is permissible. Thus, . . . the theft of several articles at the same time constitutes but one offense although such articles belong to several different owners. [Citations.] . . . If the rule were otherwise a burglar who entered an empty house and took numerous articles belonging to one person could be punished for only one offense, but if some of the articles belonged to each of the other members of the family, the burglary could be given consecutive sentences for as many offenses as there are members of the family. The situation would be even more anomalous where stolen property was

32

owned jointly or by a partnership." (*Bauer*, *supra*, 1 Cal.3d. at pp. 376-378.) Of course, identity theft was not even an offense in 1973 when *Beaumon* was decided—section 530.5 was added to the Penal Code in 1997. Additionally, in our view, identity theft is not just a property offense, as it impacts the identity, privacy and authority of its victims. When one's identity is stolen, mere money cannot compensate the victim for the time and effort that must be expended to clear the victim's good name and financial standing.

We note with interest that what defendant suggests is a blanket prohibition on separate terms when the crimes are property crimes and do not involve violence was not adhered to in *Andra,* cited above. There, the appellate court concluded that the defendant could be separately punished for identity theft, for using another person's name to obtain a credit card on December 23, 2005, and for vehicle theft, for failing on January 8, 2006 to return the car she rented using the credit card to the rental agency. (*Andra*, *supra*, 156 Cal.App.4th at p. 641.) The court concluded, "The weeks between the commission of these crimes afforded defendant ample opportunity to reflect and then renew her intent before committing the next crime. [Citation.] Moreover, these crimes . . . had two different victims: [the person whose identity defendant stole] and [the rental car agency]. Accordingly, no plausible argument can be made that defendant's sentence on either count should be stayed under section 654." (*Id*. at p. 641.) The defendant had also been convicted of identity theft for using the same woman's information to open bank accounts on January 13, 2006, and of obtaining money by false pretenses for, over the subsequent weeks, depositing fraudulent and stolen checks into these accounts, then

33

withdrawing the money. (*Id*. at pp. 641-642.) The appellate court rejected her claim that section 654 applied, saying, "[D]efendant committed these crimes weeks apart. . . . Given the temporal separation between these crimes, defendant had substantial opportunity to 'reflect' on her conduct and then 'renew' her intent to commit yet another crime. [Citation.] . . . [¶] Additionally, as with the [other] charges . . . defendant had more than one victim . . . [the person whose identity defendant stole] and . . . [the b]ank." (*Id*. at p. 642.)

In *Frederick, supra*, 142 Cal.App.4th 400, 407, as already stated,[12] the defendants operated a fraudulent "chain scheme" under which, inter alia, individual victims were falsely promised items in exchange for their contributions to the scheme. One of the defendants contended on appeal that section 654 prohibited the imposition of sentencing on several counts of grand theft because "she held but a single intent and objective—to take money from the [scheme] members—in committing [those] c[rimes] . . . ." (*Id*. at p. 420.) The appellate court concluded that section 654 did not apply because there was substantial evidence to support the sentencing court's finding that the course of conduct was divisible in time. (*Id*. at p. 421.) The appellate court added, "Moreover, the [sentencing] court stated that [defendant's] crimes involved many victims, [and] she took advantage of poor and vulnerable people . . . ." (*Ibid*.)

---

[12] See text at page 20.

34

In *People v. Neder* (1971) 16 Cal.App.3d 846, the defendant used a stolen store credit card to purchase merchandise in three different transactions on the same day at the store. (*Id*. at pp. 849-850.) The appellate court rejected defendant's contention that the three forgeries should be punished as one offense, saying, " . . . [I]t is probably true that the forgeries were motivated by a preconceived plan to obtain merchandise from [the store] by use of . . . [the stolen] credit card and by forging sales slips. . . . The real essence of the crime of forgery . . . is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud. . . . [¶] . . . [¶] Here, it might be said that the offenses were incidental to the fundamental objective of taking goods from [the store] by use of the credit card and by forging the sales slips. We feel, however, that this objective is too broad to tie the separate acts into one transaction. . . . [¶] . . . In the instant case . . . we have three separate forgeries, each directed to the obtaining of different property and none playing a part in the accomplishment of the end of the others. We do not believe that section 654 should make it a matter of indifference whether defendant, on entering [the store] with the intention to obtain goods fraudulently by means of forgery, carried out the intention one or three times." (*Id*. at pp. 852-854, fns. omitted.)

The concept of defendant characterizing his or her objective too broadly in order to take advantage of section 654 was echoed in *People v. Gangemi* (1993) 13

35

Cal.App.4th 1790, 1794, where the defendant was convicted of filing several false deeds of trust in order to protect his friend's home from being encumbered by a couple who were executing on a judgment they had obtained against the friend. The appellate court concluded, "Each offense was complete upon knowingly offering that false document for filing, and one act was not a means to the end of any of the others. It is no defense to assert that these acts were part of an indivisible transaction which had as its single criminal objective the illegal protection of [defendant's friend's] property from [the couple]. As in *Neder*, such an objective is too broad to satisfy the purposes of section 654. [¶] . . . 'To accept such a broad, overriding intent and objective to preclude punishment for otherwise clearly separate offenses would violate the statute's purpose to insure that a defendant's punishment will be commensurate with his culpability. [Citation.] It would reward the defendant who has the greater criminal ambition with a lesser punishment.' [Citation.] [Citations.] [¶] Each false filing creates a separate harm to the person defrauded as well as to the integrity of the public records and the defendant may be punished for each such criminal act. Otherwise, to apply section 654 in this case would violate the law's goal of punishing violators commensurate with their criminality." (*Id.* at pp. 1800-1801.)

Indeed, the purpose of section 654 is "to ensure that a defendant's punishment will be commensurate with his culpability." (*People v. Correa* (2012) 54 Cal.4th 331, 341.) "[A]t some point the means to achieve an objective may become so extreme they can no longer be termed 'incidental' and must be considered to express a different and more

36

sinister goal than mere successful commission of the original crime.  [¶]  . . . . [¶]  . . .

[S]ection [654] cannot, and should not, be stretched to cover . . . other criminal acts far

beyond those reasonably necessary to accomplish the original offense." (*People v.*

*Nguyen* (1988) 204 Cal.App.3d 181, 191.)  "[M]ultiple crimes are not one transaction

where the defendant had a chance to reflect between offenses and each offense carried a

new risk of harm." (*People v. Felix* (2001) 92 Cal.App.4th 905, 915.)

In *People v. Lochmiller* (1986) 187 Cal.App.3d 151, the defendant "made separate

sales at different times for different amounts of money to 10 of the 11 victims" and pled

guilty to 10 counts of selling unregistered securities.  (*Id.* at pp. 152-153.)  Division One

of this court rejected the defendant's claim that section 654 prohibited imposition of

sentence on only one of the 10 convictions, thusly, "Because each unlawful sale occurred

at different times for different amounts of money to different victims, punishment for

each separate sale is not prohibited by Penal Code section 654.  A single object, to obtain

money, does not bar multiple punishments for separate crimes.  [¶]  . . .  [¶]  [The

defendant] cites footnote 10 in the *Beamon* case in support of the argument [that] crimes

of violence are treated differently than crimes against property in applying section 654.

The principle expressed in *Beamon* is inapplicable here.  The *Beamon* court was referring

to multiple crimes committed in the course of carrying out an objective on one occasion.

With regard to incidents occurring at different times, the court said: 'It seems clear that a

course of conduct divisible in time, although directed to one objective, may give rise to

multiple violations and punishment.'  [Citation.]  [¶]  . . .  [¶]  [The defendant], through

37

her part in the unlawful scheme, took the life savings of a group of elderly citizens. She did so by making separate sales to 11 individuals on 10 occasions over a 3-month period. This was not one act or one indivisible course of conduct. To accept her argument, she could have continued to take the savings of every citizen in San Diego County and be punished no more than if she had done so to one individual. Penal Code section 654 simply does not apply." (*Id.* at pp. 153-154.)

It is notable that in *People v. James* (1977) 19 Cal.3d 99, wherein defendant was convicted of three burglaries for breaking into three offices in the same building, the defendant "claim[ed] he cannot be separately punished for each of the three burglaries because he committed them all within the confines of the same building. He points out that burglary is a crime against property, and quotes our general rule that when 'the offenses arising out of the same transaction are not crimes of violence but involve crimes against property interests of several persons, this court has recognized that only single punishment is permissible [quoting *Bauer*]. More particularly, he relies on our ensuing dictum in that opinion . . . to the effect that a thief who enters a house and steals articles belonging to different members of the same family can be punished for only one burglary. [¶] We adhere to that view, but we decline to extend it to the facts of this case at bar. Here defendant forcibly broke into three different rented premises occupied by tenants who had no common interest other than the fortuitous circumstance that they happened to lease office suites in the same commercial building. . . . If the rule were otherwise, a thief who broke into and ransacked every store in a shopping center under

38

one roof, or every apartment in an apartment building, or every room or suite in a hotel, could claim immunity for all but one of the burglaries thus perpetrated. Nothing in the statute or case law on multiple punishment compels such an incongruous result." (*Id*. at p. 119, fns. omitted.)

Count 11 involved the investors who funded the loan. They were separate victims from the Middletons, and they suffered their loss at a different time than the forgery of C.L. Middleton's name on the trust deed and promissory note. Therefore, a consecutive term for Count 11 was appropriate. The victim of count 5 was the woman whose driver's license number Macey's former neighbor used and the victim of count 6 was the man whose driver's license number Michael's mother used. As the People correctly point out, defendant could have used his own driver's license number and that of Anthony's or Macey's—he did not need to involve these two innocent bystanders. Fannie Middleton was the victim of count 8. Moreover, substantial evidence supports the sentencing court's finding that these crimes were separate from count 9 in that they occurred at a different time, (even though perhaps minutes apart)[13] than the signing of C.L. Middleton's name on the trust deed and promissory note by Macey's former neighbor. Therefore, staying punishment for these counts is not appropriate.

The People agree with Michael that count 12 should be stayed.

---

[13] See *Lopez*, *supra*, 198 Cal.App.4th 698, 718 [The time it took defendant to drive to a convenience store, park the car and walk in was sufficient time for him to reflect on the fact that he had just stolen a purse containing an access card and what he was about to do, i.e., use the card to buy items.].

For reasons expressed above, we reject Michael's assertion that the consecutive terms for counts 13-16, four counts of identity theft in connection with the failed loan from the mortgage broker for the Middleton's 43rd Street rental property—count 13 for Macey's former neighbor claiming to be C.L. Middleton, count 14 for Michael's mother claiming to be Fannie Middleton, count 15 for Macey's former neighbor using the driver's license number of the same woman mentioned in connection with count 5, and count 16 for Michael's mother using the driver's license number of the same man mentioned in connection with count 6—should have been stayed pursuant to section 654 because like count 9, these offenses were directed at obtaining money from the Middletons. The sentencing court concluded that count 13 involved a separate victim and a separate intent, and that counts 14-16 involved separate victims and those finding are supported by substantial evidence.

Michael urges the application of section 654 to several of the terms imposed for counts 22-29. Counts 23-25 were the identity thefts committed at Crawford in February 2006, for the loan on the 43rd Street rental, comprising Michael's mother posing as Fannie Middleton (count 23), Macey's former neighbor using the aforementioned female victim's driver's license number (count 24) and Michael's mother using the aforementioned male victim's driver's license number (count 25).[14] The sentencing court

[14] We note that the sentencing court stayed the term for the conviction of count 22, which comprised Macey's former neighbor posing as C.L. Middleton at Crawford, because the court imposed a term for elder abuse for Macey's former neighbor signing the documents for the Crawford loan (count 26).

40

imposed a concurrent term on count 23, and consecutive terms on counts 24 and 25, finding both involved a different victim. As before, when it was pointed out that count 23 involved a victim different from the victim of count 26 (see below), the sentencing court changed its mind about staying the term pursuant to section 654. The sentencing court also imposed consecutive terms for elder abuse (count 26), recording a false document (count 27) and operating an unlicensed escrow (count 29), finding the latter was a separate crime involving a separate victim, but stayed the term for grand theft (count 28), all in connection with this loan. We, like the People, have difficulty discerning Michael's argument in this regard. First, he appears to argue that the terms for the three identity thefts, the elder abuse, the recording of a false document and operating an unlicensed escrow should have been stayed because defendant was merely repeating what he had done at the mortgage broker, which was just trying to get money from the Middleton's property. Then, he argues that the identity thefts, the elder abuse, the recording of the false document and operating an unlicensed escrow were "interrelated prepatory steps to . . . count 28 . . . ." However, the term for count 28 was stayed under section 654. Next, he argues that the sentencing court should have stayed the punishment for all the counts involving this transaction except for the term for the elder abuse (count 26) and the recording of the false document, the latter of which is not subject to section 654. Finally, he argues that the terms for counts 23, 24, 25 and 29 should be stayed. The People concede that the term for operating an unlicensed escrow should be stayed. As to

41

the remaining counts, whatever they be, we refer Michael to the conclusions we have already reached regarding counts 5-11.

The People argued to the jury that the identity theft alleged in count 30 occurred when Michael, posing as Larry Perry, opened the account at Washington Mutual for Fidelity that ended in 296, using the California driver's license number belonging to the Orange County teacher. The sentencing court concluded that this count involved a separate victim and was separate in time from other offenses, which the court did not specify.[15] Michael here asserts that the use of the teacher's driver's license number was "incidental to and in furtherance of [his] scheme to launder the proceeds received from the Crawford-funded loan" and, therefore, should have been stayed pursuant to section 654. However, there is substantial evidence to support the sentencing court's conclusion that this count involved a separate victim, i.e., the Orange County teacher, and occurred

_____

[15] Michael misconstrues the sentencing court's earlier remarks. After the prosecutor asserted that this count was not "654[ed] to anything[,]" he then discussed the money laundering convictions in counts 31 and 32. The prosecutor explained that while the People did not charge Michael for putting the proceeds of the Crawford loan going into the Washington Mutual account, counts 31 and 32 were for him taking money out of that account. (At trial, the prosecutor had argued to the jury that these counts comprised two checks for $60,000 each taken from the Washington Mutual account ending in 296.) The sentencing court responded to *this* (and not, as Michael here asserts to the prosecutor's argument about count 30) that the only thing that saved counts 31 and 32 from being stayed was the fact that the statute on money laundering "seems to make clear that it's separate punishment for each instrument used." The sentencing court went on to express amazement that the money laundering statute so provided, thus allowing greater punishment for 10 acts of money laundering $10,000 each versus one act of money laundering $100,000.

at a different place and time than the cashing of the checks in counts 31 and 32. The account was opened on March 14, 2006 and the checks involved in counts 31 and 32 were cashed March 16 and March 21, 2006, respectively.

Next, Michael turns our attention to counts 34, 35 and 36. Count 34, recording a false document, occurred when Michael used the name of the female real estate agent to *record* a fictitious business name statement.[16] In imposing a consecutive term for it, the sentencing court concluded that it was a separate occasion and "it was used . . . to obtain separate criminal proceeds as the escrow company to get the escrow fees." Count 35, identity theft, occurred when Michael used the female real estate agent's name and broker's license number on the fictitious business name statement.[17] The sentencing court concluded that this count involved a different victim and imposed a consecutive term for it. The grand theft that comprised count 36 occurred when Michael signed the female real estate agent's name to a broker's agreement between Crawford and Inland

---

[16] Thus, contrary to the assertion in Michael's reply brief, this offense did not occur when Michael offered the fictitious business name statement to Crawford in order to obtain the broker's commission. The prosecutor reiterated this a number of times at the sentencing hearing and the sentencing court agreed with him.

[17] The prosecutor attempted to argue at the sentencing hearing that this identity theft also occurred when Michael signed the female real estate agent's name to the broker's agreement. The sentencing court correctly observed that that may not have been the basis for the jury's convicting Michael of identity theft in count 35 and, indeed, it was not. The sentencing court observed that the term for recording a false document (count 34) could not be stayed pursuant to section 654 because the statute so provided. The court then questioned whether this also prohibited the use of section 654 on the identity theft (count 35).

Mortgage which resulted in Michael receiving $3,750, rather than Crawford receiving it. The agreement, dated March 16, 2006, was signed on March 27, 2006 and the check to Inland Mortgage was dated March 16th, although it was not cashed because a stop payment had been put on it, but Crawford did not recoup the amount. The sentencing court concluded that it involved a different victim and imposed a consecutive term for it. Michael here asserts that he should be punished for only one of these crimes because the use of the female real estate agent's name and broker's license number and the filing of a fictitious business name statement were means of obtaining the $3570 broker's fee from Crawford. While that may be the case, we again find sufficient evidence to support the sentencing court's conclusion that these events occurred at different times and involved different victims. The fictitious business name statement was filed on March 16, 2006, obviously after Michael placed the female real estate agent's name and broker's license number on it. The victim of this count were all those who rely on the authenticity of documents which are recorded. The identity theft occurred, as already stated, before the recording of this statement, when Michael placed the female real estate agent's name and broker's license number on the statement. The victim of this count, as the sentencing court found, was the female real estate agent. Also as the sentencing court found, the victim of the grand theft was Crawford and that theft occurred after the other two counts, when Crawford did not recoup the $3,750.

Finally, Michael asserts that section 654 should have been applied to counts 38 and 46. As to count 38, which comprised operating an unlicensed escrow, it occurred

44

when Fidelity acted as the escrow agent for the purchase of a home by Anna Smith, including giving Smith escrow instructions. Count 37, grand theft, occurred when Anna Smith gave Fidelity $2500 towards the purchase of a house, which funds were never returned to her, although she did not buy a house involving Fidelity. Michael asserts that his use of Fidelity was incidental to the taking of the $2,500 from Smith and the People agree. Therefore, the consecutive term imposed for count 38 must be stayed pursuant to section 654. The same applies to count 46, operating an unlicensed escrow, which was Realty Services Escrow in connection with the purchase of the Alhambra Lane, Perris property, which should be stayed as to count 47, which was for the loan on that property by WMC for Robert Peters.

b. *Anthony*

*People v. Brown* (2012) 54 Cal.4th 314, having become final since the briefs in this case were authored, the parties agree that Anthony is entitled to an additional 112 days of credits for the 225 of presentencing time he served, for a total of 2165 days of credit.

## DISPOSITION

For Michael, the following are reversed: the enhancement under section 12022.6, subdivision (a)(2) as to count 10 and counts 18, 19, 20, 21 and 33. The sentences imposed for them are stricken. The terms for counts 12, 29, 38 and 46 are stayed pursuant to section 654. The trial court is directed to amend the abstract of judgment to

45

reflect these changes, and to recalculate the total sentence, in addition to the following: the terms for count 2 is 8 months consecutive and count 23 is 2 years concurrent.

For Anthony, counts 18, 19 and 33 are reversed and the sentences imposed for them are stricken. Anthony is to be resentenced for count 44 and is to receive 2165 days of credit.

For Macey, counts 20 and 21 are reversed and the sentenced imposed for them are stricken. Macey is to be resentenced on his remaining convictions.

RAMIREZ
P. J.

We concur:

McKINSTER
J.

KING
J.

46

Filed 7/9/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH DISTRICT

DIVISION TWO

STATE OF CALIFORNIA

<u>ORDER</u>

| | |
|---|---|
| THE PEOPLE, | E052088 |
| Plaintiff and Respondent, | |
| v. | (Super.Ct.Nos. RIF132760 & |
| ANTHONY M. DEVAUGHN, | RIF148262) |
| Defendant and Appellant. | OPINION |
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056252 |
| v. | |
| STEPFON MACEY, | (Super.Ct.Nos. RIF132760 & |
| Defendant and Appellant. | RIF148262) |

| | |
|---|---|
| THE PEOPLE, | E053067 |
|     Plaintiff and Respondent, | (Super.Ct.Nos. RIF132760 & |
| v. | RIF148262) |
| MICHAEL OWEN DEVAUGHN, | |
|     Defendant and Appellant. | |

A request having been made to this court pursuant to California Rules of Court, rule 8.1120(a), for publication of a nonpublished opinion heretofore filed in the above matter on June 18, 2014, and it appearing that the opinion meets the standards for publication as specified in California Rules of Court, rule 8.1105(c),

IT IS ORDERED that said opinion be certified for publication pursuant to California Rules of Court, rule 8.1105(b).

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J

I concur:

McKINSTER
J.

Cc: See attached list