Filed 8/7/15  P. v. Brass CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ISAAC LAMONT BRASS, JR.,<br><br>　　　Defendant and Appellant. | E060714<br><br>(Super.Ct.No. FSB1302919)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  R. Glenn Yabuno, Judge.  Affirmed as modified and remanded with directions.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Lise Jacobson and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Isaac Lamont Brass was a member of a Blood-affiliated gang. He suspected that his friend Ronald Gibson had helped Gibson's cousin to put the moves on defendant's girlfriend. Accordingly, defendant went looking for Gibson; when he found him, defendant accosted him, pointed a gun at him, threatened him, and fired one shot within inches of his head.

Defendant was convicted of various felonies, including attempted murder and possession of a firearm by a felon, all with gang enhancements and most with on-probation enhancements.

Defendant now contends:

1. There was insufficient evidence of intent to kill to support the conviction for attempted murder.

2. There is no such thing as an "on-probation" enhancement.

3. An on-probation enhancement (assuming it exists) can be imposed only once per case.

4. Separate sentencing for both attempted murder and possession of a firearm by a felon violated Penal Code section 654.

5. Separate sentencing on multiple gang enhancements violated Penal Code section 654.

6. There are errors in the abstract of judgment.

We agree that there is no such thing as an on-probation enhancement. Accordingly, in our disposition, we will strike these purported enhancements. We also agree that the abstract must be corrected. Otherwise, we find no error.

## I

## FACTUAL BACKGROUND

As of July 2013, victim Ronald Gibson had known defendant for about a month. They first met when Gibson was dating defendant's sister, Tiania Cole. Gibson considered defendant to be a friend.

A few days before the shooting, defendant's "baby mama" asked Gibson to help her change a tire. She said that defendant was supposed to do it, but he had been gone for a couple of weeks. Gibson, along with his cousin Marcus Santiful, went over to her house and changed the tire for her.

On July 9, 2013, Santiful drove Gibson from Victorville to San Bernardino. Their original plan was to visit Cole. While they were on the way, however, Cole phoned them. She told them not to come because defendant "was coming with his buddies with some guns to come look for [them]."

Defendant also phoned them. He accused Santiful of "trying to fuck my baby mama . . . ." He said, "When I see [Santiful] I'm going to shoot him in the face." Defendant also accused Gibson of "try[ing] to hook [Santiful] up with [defendant's] baby mama . . . ."

3

Rather than visit Cole, Gibson and Santiful went to visit Gibson's cousin Ryan. Ryan lived at a housing complex in San Bernardino. While they were there, they got a phone call saying that defendant was on his way.

Gibson and Santiful were outside talking to Ryan when defendant and some friends of his pulled up in a white (or possibly gray or silver) Ford Contour. Defendant got out and started "jogging" toward Gibson. Defendant said to Gibson, "I want to catch a fade with you and your cousin. Where your cousin at?" Gibson testified that to "catch a fade" means to fight.

Gibson asked, "What's going on? What's up?" At that point, defendant pulled a revolver out from his waistband and cocked it. Santiful ran away and into Ryan's house.

Defendant grabbed Gibson's shirt. He said, "I don't want to make a mess right here. Come over here in between the cars." He "pinned" Gibson between Santiful's SUV and another car. He pointed the gun variously at Gibson's head and chest. Gibson tried to move, to keep the gun away from his head, but defendant said, "If you keep moving, I'm gonna pop you."

Defendant put his hand in Gibson's pockets and asked, "Where the money at?" Gibson said, "Man, I ain't got nothing but $20." Defendant said, "Run that shit on Bloods[.]" Gibson explained that "'Run that shit' means give up what you got. 'On Bloods' means . . . like an oath, like he's swearing on that."

Defendant kept asking where Santiful was. He also said, "This is PDL." Gibson knew this meant Pasadena Denver Lanes, which was defendant's gang.

4

Gibson said, "Is this how it's gonna end for me, I'm gonna die from this raggedy gun?" At that point, defendant fired one shot. When the gun went off, it was next to Gibson's ear, eight or ten inches away. Although Gibson denied it at trial, he told the police that "he had to duck his head" to avoid being hit by the bullet.

Defendant's friends in the car were yelling, "[S]hoot that nigger[,] Blood." Defendant used his left hand to punch Gibson in the face. He ran to the car and tossed the gun inside; the car drove away.

Defendant started following Gibson around the complex. Gibson thought defendant wanted to fight him. Gibson tried to hide, first at Ryan's house and then at a friend's house, but they would not let him in. A security guard intercepted defendant about 200 yards away from the scene of the shooting and detained him.

Around this time, the police arrived. Santiful gave the police a description of the shooter. However, he claimed he did not know who the shooter was. At trial, he admitted he did not want to be a "snitch."

In an in-field show-up, Gibson identified defendant as "the mother fucker who shot at me." Santiful refused to participate in a showup, explaining that he was afraid of retaliation.

When the police interviewed defendant, he said that he had a "beef" with Gibson and they had been fighting about it. When asked if he had approached a white car, defendant said he had placed his cell phone in the car. When asked if he had fired a gun,

5

he said he had fired a gun the previous day; he added that, as a result, there might be gunshot residue (GSR) on his hands.

A GSR test revealed no GSR on defendant's right hand and a single particle of GSR on his left hand. Ordinarily, firing a handgun would deposit anywhere from dozens to thousands of particles on the shooter's hand. However, an expert testified that GSR can fall off, and it was "not unusual" to find only one particle half an hour after a shooting. Also, because defendant was in handcuffs and uncooperative, it was only possible to test his palms, not the backs of his hands.

There was ample evidence that defendant was an active member of Pasadena Denver Lanes (PDL), a criminal street gang[1] affiliated with the Bloods, and that the crimes were gang-motivated.

In July 2012, defendant had pleaded guilty to maintaining a place where narcotics were used (Health & Saf. Code, § 11366), as a felony, and had been placed on probation for three years.[2]

---

[1] The evidence showed two prior predicate offenses: sale of a controlled substance, committed by McKinley Tarpley in July 2008, and unlawful possession of a firearm, committed by Damon Todd in December 2011. Because these were committed by single individuals more than three years apart, they could not, standing alone, satisfy the statutory definition of a "pattern of criminal gang activity." (Pen. Code, § 186.22, subd. (e).) The current charged offenses, however, could also serve as predicate offenses. (*People v. Gardeley* (1996) 14 Cal.4th 605, 624-626.) The jury was so instructed.

[2] The fact that the duration of the probation was three years was shown only by a probation officer's declaration. Arguably, this was inadmissible hearsay. However, defense counsel did not object to the declaration on hearsay grounds. Accordingly, the jury was free to consider the declaration for its truth. (*People v. Baker* (2012) 204 Cal.App.4th 1234, 1245 [Fourth Dist., Div. Two].)

Markiesha Brown testified that she was defendant's girlfriend and the mother of his child. According to Brown, Gibson had never come to her house and had never changed a tire for her.

Tiania Cole testified that she was defendant's sister and Gibson's former girlfriend. She denied ever calling Gibson and telling him that defendant was looking for him.

II

PROCEDURAL BACKGROUND

After a jury trial, defendant was found guilty as follows:

| Count | Charge | Gang enhancement (Pen. Code, § 186.22, subd. (b)) | Firearm enhancement (See below) | On-probation enhancement (Pen. Code, § 12022.1, subd. (f)) |
|---|---|---|---|---|
| 1 | Attempted murder (Pen. Code, § 187, subd. (a), 664) | X | X (Pen. Code, § 12022.53, subd. (c)) | X |
| 2 | Criminal threat (Pen. Code, § 422) | X | X (Pen. Code, § 12022.5, subd. (a)) | X |
| 3 | Possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)) | X | | X |
| 4 | Assault with a firearm (Pen. Code, § 245, subd. (a)(2)) | X | X (Pen. Code, § 12022.5, subd. (a)) | |

As a result, defendant was sentenced to a total of 43 years 4 months in prison, calculated as follows:

Count 1:  Nine years (the upper term) for attempted murder, plus twenty years for the firearm enhancement, plus ten years for the gang enhancement, plus two years for the on-probation enhancement, for a subtotal of forty-one years.

Count 3:  Eight months (one-third the midterm) for possession of a firearm by a felon, plus one year (one-third the midterm) for the gang enhancement, plus eight months (one-third the midterm) for the on-probation enhancement, for a subtotal of two years four months, to be served consecutively.

Counts 2 and 4:  Stayed pursuant to section 654.

III

THE SUFFICIENCY OF THE EVIDENCE OF INTENT TO KILL

Defendant contends that there was insufficient evidence of intent to kill to support his conviction for attempted murder.

"""When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]  We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

[Citation.]  In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  [Citation.]'  [Citation.]"  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.)

"""'"[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.'  [Citation.]"'  [Citation.]"  (*People v. Clark* (2011) 52 Cal.4th 856, 945.)

"""'"[T]he crime of attempted murder requires a specific intent to kill . . ."  [Citation.]'  [Citation.]"  (*People v. Gonzalez* (2012) 54 Cal.4th 643, 664.)  "[I]ntent to kill . . . may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.]"  (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

"[A] defendant may properly be convicted of attempted murder when no injury results.  [Citation.]"  (*People v. Avila* (2009) 46 Cal.4th 680, 702.)  "There is nothing inherently illogical or absurd in a finding that a person who unsuccessfully attempted to kill another did so with the intent to kill."  (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945.)

"[E]vidence of motive is often probative of intent to kill."  (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.)  Here, defendant was angry with Gibson for supposedly trying to help Santiful "hook . . . up" with defendant's girlfriend.  He armed himself with a loaded gun and went looking for both Gibson and Santiful.  He expressly threatened to shoot Santiful "in the face."  It is reasonable to conclude that he had a similar plan for Gibson.

9

When defendant found Gibson, he immediately cocked his gun.  He pushed Gibson between two cars, saying, "I don't want to make a mess right here."  He kept pointing the gun at Gibson's head and chest.  Gibson said, "Is this how it's gonna end for me, I'm gonna die from this raggedy gun?"  At that point, Gibson testified, "[defendant] got mad, and he was, like, what?  And shot, like serious, like this is, you know, knock your head off . . . ."  When defendant fired, the gun was within eight or ten inches of Gibson's head.

Gibson told the police that defendant fired "at his head."  He also told them that he had to duck to avoid being shot.  Although he contradicted this at trial, he did testify that he was moving around in an effort to keep the gun away from his head.  From this evidence, a jury could reasonably conclude that when defendant fired, he intended to shoot Gibson, and he failed to do so only because he missed.

"""The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance.  Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind."  [Citation.]  [Citation.]"  (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.)

Defendant makes much of Gibson's testimony that defendant fired "in the air."  At that moment, however, the gun was next to Gibson's ear, and thus not directly in his line of sight.  At trial, Gibson explained that, because the bullet did not hit him, he assumed

10

that defendant must have fired it in the air. The jury was free to conclude that defendant did not fire in the air on purpose.

Defendant also cites Gibson's testimony that defendant only intended to scare him or to show him that he was serious. Gibson, however, could not read defendant's mind; the jury was free to second-guess his conclusions. Moreover, Gibson admitted that he did not want to be a snitch and that "snitches get stitches" (or "ditches," meaning graves). Thus, the jury could conclude that he was just making excuses for defendant.

Gibson did admit that, while he thought at first that defendant was "just trying to embarrass [him]," "it got real when [he] heard the shot." He also testified that he believed at the time that defendant wanted to kill him, "because I've never known no one pull out a gun and be from the streets and not be ready to use it . . . ."

Accordingly, while it might have been reasonable for the jury to come to a different conclusion, there was substantial evidence that defendant fired the shot with the intent to kill.

IV

THE ON-PROBATION ENHANCEMENT

Defendant contends that there is no such thing as an "on-probation" enhancement; an enhancement under Penal Code section 12022.1 (section 12022.1) applies only to crimes committed while on bail or while released on one's own recognizance, and thus there is no evidence to support the enhancement in this case.

11

"'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.'  [Citation.]  'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.'  [Citations.]  The plain meaning controls if there is no ambiguity in the statutory language.  [Citation.]  If, however, 'the statutory language may reasonably be given more than one interpretation, ""'"courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute."'"'  [Citation.]" (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.)

Section 12022.1 defines what is commonly known as the "on-bail enhancement." (E.g., *People v. Meloney* (2003) 30 Cal.4th 1145, 1148-1149.)  As relevant here, it provides:

"(a) For the purposes of this section only:

"(1) *'Primary offense' means a felony offense for which a person has been released from custody on bail or on his or her own recognizance* prior to the judgment becoming final, including the disposition of any appeal, or for which release on bail or his or her own recognizance has been revoked.  In cases where the court has granted a stay of execution of a county jail commitment or state prison commitment, 'primary offense' also means a felony offense for which a person is out of custody during the period of time

between the pronouncement of judgment and the time the person actually surrenders into custody or is otherwise returned to custody. [Hereafter subdivision (a)(1).]

"(2) *'Secondary offense' means a felony offense alleged to have been committed while the person is released from custody for a primary offense.*

"(b) Any person arrested for a secondary offense that was alleged to have been committed while that person was released from custody on a primary offense shall be subject to a penalty enhancement of an additional two years, which shall be served consecutive to any other term imposed by the court. [Hereafter subdivision (b).] [¶] . . .

"(d) Whenever there is a conviction for the secondary offense and the enhancement is proved, and the person is sentenced on the secondary offense prior to the conviction of the primary offense, the imposition of the enhancement shall be stayed pending imposition of the sentence for the primary offense. The stay shall be lifted by the court hearing the primary offense at the time of sentencing for that offense and shall be recorded in the abstract of judgment. If the person is acquitted of the primary offense the stay shall be permanent. [Hereafter subdivision (d).]

"(e) If the person is convicted of a felony for the primary offense, is sentenced to state prison for the primary offense, and is convicted of a felony for the secondary offense, any sentence for the secondary offense shall be consecutive to the primary sentence . . . . [Hereafter subdivision (e).]

"(f) *If the person* is convicted of a felony for the primary offense, *is granted probation for the primary offense*, and is convicted of a felony for the secondary offense,

13

any sentence for the secondary offense shall be enhanced as provided in subdivision (b). [Hereafter subdivision (f).]" (Italics added.)

Here, there was no evidence of a primary offense as defined in subdivision (a)(1). In other words, while there was evidence that defendant had been convicted of a prior felony, there was no evidence that defendant had been released on bail (or on his own recognizance) prior to the judgment becoming final in that case. There was also no evidence that the prior felony met the definition of a primary offense in any other way; for example, there was no evidence that the court in the prior case stayed the execution of a prison commitment. Because there was no evidence of any primary offense, there was likewise no evidence of any secondary offense.

The People rely on subdivision (f). They argue that defendant had been convicted of a felony in the prior case; defendant had been granted probation in the prior case; and defendant was convicted of a felony in this case. This assumes, however, that the prior felony qualified as a "primary offense." As already discussed, it did not.

The People also quote *People v. Walker* (2002) 29 Cal.4th 577 to the effect that "'the purpose and intent behind a section 12022.1 enhancement, generally speaking, is . . . to penalize *recidivist* conduct with increased punishment.' [Citations.]" (*Id*. at p. 584.) This ignores the additional statement in *Walker* that "section 12022.1 turns on the defendant's *on-bail* recidivism." (*Id*. at p. 585, italics added.) Similarly, *Walker* stated that "the Legislature evidently views those who qualify under section 12022.1 . . . as

14

being particularly deserving of increased punishment for their *on-bail* recidivism." (*Id.* at pp. 583-584, italics added.)

The Legislature intended an enhancement under section 12022.1 to apply only if "the defendant ultimately is convicted of both the primary and secondary felony offenses. [Citations.]" (*People v. Meloney*, *supra*, 30 Cal.4th at p. 1156, fn. 9.) It drafted subdivisions (d), (e), and (f) to deal with three ways this can happen:

1. The defendant may be convicted of the secondary offense before being convicted of the primary offense. In that event, under subdivision (d), the court hearing the secondary offense must impose the enhancement, but must also stay it unless and until the person is convicted of the primary offense. (See *People v. Meloney*, *supra*, 30 Cal.4th at pp. 1156-1160.)

2. The defendant may be convicted of the primary offense and be sentenced to prison before being convicted of the secondary offense. In that event, under subdivision (e), the court hearing the secondary offense not only must impose the enhancement under subdivision (b), but also must run the sentence on the secondary offense consecutively to the sentence on the primary offense. (See *People v. Baries* (1989) 209 Cal.App.3d 313, 319-323.)

3. The defendant may be convicted of the primary offense and be placed on probation before being convicted of the secondary offense. In that event, under subdivision (f), the court hearing the secondary offense need only impose the enhancement under subdivision (b). (See *People v. Baries*, *supra*, 209 Cal.App.3d at

15

p. 323.)  There is no need to specify that sentencing must be consecutive rather than concurrent.  Thus, as one court has observed, in light of subdivision (b) itself, subdivision (f) is technically "surplus."  (*Baries*, *supra*, at p. 323.)

In sum, then, subdivision (f) does not create some kind of free-standing on-probation enhancement.  Like subdivisions (d) and (e), it applies only when there is a "primary offense" — defined as an offense in which the defendant was released on bail — and a secondary offense — defined as an offense committed while released from custody on a primary offense.

Accordingly, an enhancement under section 12022.1 simply did not apply in this case.  In our disposition, we will strike all of these enhancements and the related punishment.  Defendant's alternative contention that an enhancement under section 12022.1 can be imposed only once per case is moot.

V

APPLICATION OF SECTION 654

Defendant raises two separate contentions involving Penal Code section 654 (section 654).

A.     *General Legal Principles*.

Section 654, subdivision (a), as relevant here, states:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

16

""""Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."'" [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 885, petn. for cert. filed Oct. 28, 2014.)

"""'A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence.' [Citation.]" [Citation.]' [Citations.]" (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, disapproved on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

B.     *The Application of Section 654 to the Sentence*

       *for Possession of a Firearm by a Felon.*

Defendant contends that the imposition of separate and unstayed terms for both attempted murder and possession of a firearm by a felon violated Penal Code section 654.

When a defendant has been convicted of both unlawful possession of a firearm and an offense involving the use of or arming with the same firearm, the test for the application of section 654 is fairly clear. "'[S]ection 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm.' [Citation.]" (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1379.) "In contrast, multiple punishment is improper where the evidence shows that, at most, 'fortuitous circumstances put the firearm in the defendant's hand only at the instant

17

of committing another offense' [citation] . . . ." (*People v. Vang* (2010) 184 Cal.App.4th 912, 916; accord, *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1565; *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1412 [Fourth Dist., Div. Two].)

Thus, for example, in *People v. Jones* (2002) 103 Cal.App.4th 1139, the defendant fired several shots at the victim's home as he drove by in a car. (*Id*. at p. 1142.) The court held that he could be punished for both shooting at an inhabited dwelling and possession of a firearm by a felon. (*Id*. at pp. 1142-1149.) "[W]hen an ex-felon commits a crime using a firearm, and arrives at the crime scene already in possession of the firearm, it may reasonably be inferred that the firearm possession is a separate and antecedent offense, carried out with an independent, distinct intent from the primary crime." (*Id*. at p. 1141.)

In this case, Cole warned Gibson and Santiful that "defendant was coming with his buddies with some guns to come look for [them]."[3] Defendant himself threatened, "When I see [Santiful] I'm going to shoot him in the face." This implied that he was armed at all times, just in case. When defendant finally located Gibson and Santiful, he got out of the white car with the gun already in his waistband.

Defendant relies on the fact that one of his "buddies" in the white car was heard to say, "Bring my gun back." The fact that someone else owned the gun (if it is a fact) is a red herring. Ownership is distinct from possession. "Property may be in the joint

---

[3] Defense counsel did not object to this statement as hearsay, and the jury was never instructed that it could not consider it for its truth.

18

possession of several persons." (*People v. Bonner* (2000) 80 Cal.App.4th 759, 763.)

Defendant had at least constructive possession of the gun as long as he "' . . . knowingly

exercised a right to control the prohibited item, either directly or through another person.'

[Citation.]" (*People v. Brimmer* (2014) 230 Cal.App.4th 782, 795 [Fourth Dist., Div.

Two].) The evidence indicates that he felt secure in his right to control the gun whenever

he wanted. In fact, the evidence strongly suggests that the gun was a "gang gun,"

possessed jointly by all of the members of his gang.

We therefore conclude that the trial court could properly impose separate and

unstayed punishment for both attempted murder and possession of a firearm by a felon.

C. *The Application of Section 654 to the Sentences*

*on the Gang Enhancements to Count 1 and Count 3*.

Defendant also contends that the imposition of separate and unstayed terms on the

gang enhancements to both count 1 and count 3 violated Penal Code section 654.

In general, an enhancement can be classified as either a "status enhancement,"

which turns on the nature of the offender, or a "conduct enhancement," which turns on

the nature of the offense. (*People v. Martinez* (2005) 132 Cal.App.4th 531, 535-536.)

In *People v. Coronado* (1995) 12 Cal.4th 145, the Supreme Court held that section

654 does not apply to status enhancements. (*Coronado*, *supra*, at pp. 157-159.) More

recently, however, in *People v. Ahmed* (2011) 53 Cal.4th 156, the Supreme Court held

19

that section 654 *can* apply to conduct enhancements. (*Ahmed*, *supra*, at p. 163.)[4] It cautioned, however, that particular sentencing statutes may override the application of section 654. (*Ahmed*, *supra*, at pp. 162-163.) "Only if the specific statutes do not provide the answer should the court turn to section 654." (*Id*. at p. 163.)

The court further cautioned: "[E]nhancements are different from substantive crimes, a difference that affects *how* section 654 applies to enhancements. Provisions describing substantive crimes . . . generally define criminal *acts*. But enhancement provisions do not define criminal acts; rather, they increase the punishment for those acts. They focus on *aspects* of the criminal act that are not always present and that warrant additional punishment. [Citations.]

"Sometimes separate enhancements focus on different aspects of the criminal act. . . . Conversely, sometimes separate enhancements focus on the same aspect of a criminal act. . . .

" . . . If section 654 barred *any* additional punishment for a single criminal act, then no enhancement at all would be permitted, a result obviously inconsistent with the function of sentence enhancements. Thus, when applied to multiple enhancements for a single crime, section 654 bars multiple punishment for the same *aspect* of a criminal act." (*People v. Ahmed*, *supra*, 53 Cal.4th at pp. 163-164, fn. omitted.)

---

[4] Even before *Ahmed*, this court had long held that section 654 can apply to conduct enhancements. (*People v. Moringlane* (1982) 127 Cal.App.3d 811, 817-819 [great bodily injury enhancements] [Fourth Dist., Div. Two] disapproved on unrelated grounds in *People v. Jones* (1991) 53 Cal.3d 1115, 1144-1145.)

20

The People do not dispute that a gang enhancement is a conduct enhancement, rather than a status enhancement. This implicit concession is well-advised. A gang enhancement applies when the defendant committed the underlying felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Pen. Code, § 186.22, subd. (b).) Thus, it turns on the circumstances of the commission of the particular offense. It does not punish a defendant for the mere status of being a gang member. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 663.) In fact, gang membership is not even an element of the enhancement. (*People v. Valdez* (2012) 55 Cal.4th 82, 132.)

The People also do not argue that the gang enhancement statute creates an express or implied exception to section 654. Again, we believe this is the better part of valor. The express language of the gang enhancement does not create any such exception; the bare directive that the defendant "shall . . . be punished" with the enhancement (Pen. Code, § 186.22, subd. (b)) is insufficient to override section 654. (See *People v. Calderon* (2013) 214 Cal.App.4th 656, 663-664.)

The People do argue, however — quoting *People v. Wooten* (2013) 214 Cal.App.4th 121, 130 — that "if section 654 does not bar punishment for two crimes, then it cannot bar punishment for the same enhancements attached to those separate substantive offenses." This approach, however, is in some tension with this court's decision in *People v. Douglas* (1995) 39 Cal.App.4th 1385 [Fourth Dist., Div. Two].

21

There, we held that, even though the defendant could be separately punished on count 1 (kidnapping for robbery), count 3 (forcible oral copulation), and count 4 (rape), he could not be separately punished on kidnapping enhancements (Pen. Code, § 667.8) to count 3 and count 4. (*Douglas*, *supra*, at pp. 1394-1395.) There has been a lot of water under the bridge since *Douglas* was decided; the day may come when we are called on to reconsider it in light of *Ahmed* or other later cases. For purposes of this case, however, we find it unnecessary to do so, because we can resolve the present issue on narrower grounds.

Even under a classic section 654 analysis, "'" . . . 'a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]' [Citations.] This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken. [Citation.]" [Citations.]' [Citation.]" (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113 [Fourth Dist., Div. Two].)

Here, as we have already held (see part V.B, *ante*), defendant's unlawful possession of the firearm was divisible in time and place from the attempted murder. Thus, it would be unduly broad to say that he was acting with an overall intent and objective of benefiting his gang and facilitating criminal conduct by gang members. Rather, defendant first rounded up his buddies, made sure he had access to a gun, and told Cole that he was looking for Gibson. The trial court could reasonably find that, at that

point, defendant committed possession of a firearm by a felon with the intent and objective of benefiting his gang and facilitating criminal conduct by gang members.

Thereafter, defendant had ample time to reflect on this intent. He was evidently looking for Gibson around town. Nevertheless, when he tracked Gibson down, he fired a shot at him. The trial court could reasonably find that, at that point, defendant committed attempted murder with the new and separately formed intent and objective of benefiting his gang and facilitating criminal conduct by gang members. (Cf. *People v. Clair* (2011) 197 Cal.App.4th 949, 957-962 [defendant could be separately punished for sending child pornography repeatedly, as little as 10 minutes apart, to same recipient].)

We therefore conclude that the trial court could properly impose separate and unstayed punishment on the gang enhancements to count 1 and count 3.

VI

ABSTRACT OF JUDGMENT

Defendant contends that the abstract of judgment is erroneous in two respects.

First, it indicates that defendant was convicted of "first degree" attempted murder; actually, while there was an allegation that the attempted murder was willful, deliberate and premeditated, the jury found that allegation not true. The People concede the error, and we agree.

Second, it does not indicate that defendant is entitled to any presentence credit; actually, the trial court awarded him 269 days of credit (234 actual days plus 35 days conduct credit). Again, the People concede the error, and we agree.

23

In our disposition, we will direct the clerk of the superior court to correct the abstract.

## VII

## DISPOSITION

The on-probation enhancements (Pen. Code, § 12022.1, subd. (f)) to each count, along with the terms imposed thereon, are stricken. This reduces the total aggregate term to 40 years 8 months in prison. The judgment as thus modified is affirmed.

The clerk of the superior court is directed to prepare an amended sentencing minute order and an amended abstract of judgment, correcting the errors identified in part VI, *ante*, and to forward a certified copy of the amended and corrected abstract to the Department of Corrections and Rehabilitation. (Pen. Code, §§ 1213, subd. (a), 1216.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

MILLER
J.

24