Filed 6/21/21  P. v. Diaz CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GUSTAVO GUZMAN DIAZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B302784<br>(Super. Ct. No. 2015039117)<br>(Ventura County) |

> Gustavo Guzman Diaz appeals from the judgment after the jury convicted him of attempted murder with premeditation and deliberation (count 1, Pen. Code,[1] §§ 664/187, subd. (a)), kidnapping (count 2, § 207, subd. (a)), assault with a deadly weapon (count 3, § 245, subd. (a)(1)), criminal threats (count 4, § 422), and corporal injury to a spouse (count 5, § 273.5, subd. (a)), and found true allegations that he used a deadly weapon (§ 12022, subd. (b)(1)) and caused great bodily injury

---

[1] All subsequent undesignated statutory references are to the Penal Code.

(§ 12022.7, subd. (e)).  The trial court sentenced Diaz to an indeterminate sentence of seven years to life in state prison, and a determinate prison sentence of 16 years, four months.

Diaz contends:  (1) the evidence was insufficient that the attempted murder was willful, deliberate, and premeditated, (2) the trial court erred in permitting testimony of an incompetent witness, (3) counsel rendered ineffective assistance, and (4) the sentences for criminal threats and kidnapping must be stayed.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Diaz and J.P. were married for approximately three years.  During their marriage, Diaz accused J.P. of being unfaithful and "always thought [she] was cheating on him."  His jealousy sometimes led to violence.  Their divorce was almost final.

As J.P. drove to work between 4:45 and 5:00 a.m., she noticed a white car following her.  It coasted silently behind her with the headlights off.  Diaz was driving the white car.  His brother D.F. lay in the back seat so J.P. would not see him.  Diaz was armed with a knife.

When J.P. parked, Diaz got out of his car.  As she opened her car door, Diaz stood next to the door holding the knife.  He told her to stay in the car or he would kill her.  She climbed over the center console into the passenger seat.

Diaz got into the driver's seat of J.P.'s car and sped away.  He was "driving crazy," in and out of lanes.  He said he was going to kill J.P. and himself.  He said their daughter would be better off with his parents.  He threw her wallet and phone out the window.  He held the knife throughout the drive.

Diaz asked J.P. for her boyfriend's name and address,

but she refused.  He asked if J.P. had sex with her boyfriend.  When she said yes, Diaz repeated that he would kill her.  Diaz made a phone call and said, "Meet me where I used to work in the nursery plant.  [¶] . . . [¶]  We're going to have fun because this bitch likes [sex]."

When the car stopped at a red light near a gas station, J.P. opened the car door and attempted to get out.  She did so because she "knew he was going to kill me."  Diaz grabbed her, pulled her back into the car, and stabbed her twice in the back.  He told her she "should have never done that."  As he continued driving erratically, he stabbed her in the chest and arms.

J.P. was scared and feared for her safety.  She opened the car door, jumped out of the moving car, and rolled onto the street.  She stood up and pounded on the side of a truck.  She screamed, "He's trying to kill me, he's going to come back, help, let me in."  The driver let her into the truck and called 911.

Diaz sped off.  The car was found abandoned about 15 miles from where she jumped out.  The knife was found near the road.  Blood on the blade contained DNA matching J.P.

J.P. suffered knife cuts on her collarbone and five stab wounds:  two in her back, one in her chest, one near her left underarm, and one in her right arm.  She had head injuries and body abrasions from jumping out of the car.  At the hospital, she was treated with stitches, staples in her head, and a chest tube for a collapsed lung from a stab wound.

The trial court sentenced Diaz to an indeterminate term of seven years to life for attempted murder (count 1), and a determinate term of 16 years, four months, consisting of:  five years for kidnapping (count 2); eight months consecutive for

3

criminal threats (count 4); enhancements for use of a deadly weapon of one year each for counts 1 and 2, and eight months for count 4; and great bodily injury enhancements of four years each for counts 1 and 2. The court stayed sentences pursuant to section 654 for assault with a deadly weapon along with its great bodily injury enhancement (count 3), and corporal injury to a spouse along with its deadly weapon and great bodily injury enhancements (count 5).

## DISCUSSION

### *Intent*

Diaz contends the evidence was insufficient to establish that the attempted murder was willful, deliberate, and premeditated. This contention lacks merit.

Attempted murder is not divided into degrees. However, if the trier of fact determines it is willful, deliberate and premeditated, the punishment is increased to life in prison with the possibility of parole after serving at least seven years. (§§ 664, subd. (a); 3046, subd. (a); *People v. Gonzalez* (2012) 54 Cal.4th 643, 654.) We review the entire record in the light most favorable to the judgment to determine if it contains substantial evidence from which a reasonable trier of fact could find the attempted murder was willful, deliberate, and premeditated. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.)

"'[W]ilful, deliberate, and premeditated killing [] is proper only if the slayer killed "as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on cooly and steadily, [especially] according to a *preconceived design*." [Citation.]'" (*People v. Anderson* (1968) 70 Cal.2d 15, 26 (*Anderson*).) "[P]remeditation can occur in a brief

4

period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'" (*People v. Perez* (1992) 2 Cal.4th 1117, 1127.)

*Anderson* described three categories of evidence regarding premeditation and deliberation: (1) planning activity, (2) motive, including the defendant's prior relationship with the victim, and (3) a manner of killing that demonstrates intent to kill as part of a preconceived design. (*Anderson*, *supra*, 70 Cal.2d at pp. 26-27.) The *Anderson* guidelines are merely descriptive and are "intended only as a framework to aid in appellate review." (*People v. Perez*, *supra*, 2 Cal.4th at p. 1125.) They are neither exclusive nor exhaustive and do not "define the elements" of the crime. (*Ibid*.)

All three *Anderson* factors are present here. Diaz planned the attack by arming himself with a knife. (*People v. Elliot* (2005) 37 Cal.4th 453, 471.) He followed the victim in predawn hours with his lights and engine off. He hid his brother in the back seat to drive his car away after Diaz abducted J.P. in her car. The moment he contacted her, he demanded at knifepoint that she remain in her car.

The motive of jealousy was demonstrated by his questions in the car about her boyfriend. He told her he was going to kill her and that their daughter would be raised by his parents.

The manner of killing showed a preconceived design. Diaz concedes in his opening brief that he "carried out [his] intent by bringing a knife and kidnapping [J.P.] at knife point so that he could kill her." He threw the victim's phone out the window so she could not summon help. He stabbed her in areas likely to

strike vital organs.  (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [premeditated deliberate murder where gunshot to vital area of body and victim prevented from calling ambulance].)  Substantial evidence established that the crime was willful, deliberate, and premeditated.

### *Competence of witness*

Diaz contends that D.F. was not a competent witness and the trial court erred in permitting him to testify.  We disagree.

D.F. was sworn as a witness and testified through a Spanish-language interpreter.  After he consulted with an attorney, the court granted him immunity.

Based on an Individualized Education Program (IEP) report from six years earlier, D.F.'s attorney expressed concern regarding D.F.'s memory and whether he was "understanding everything that's been going on here."  But he added, "Our interactions have seemed to be okay.  He seems to understand what's going on."  The attorney stated that if D.F. were a criminal defendant, he would not declare a doubt as to his competence pursuant to section 1368.

The IEP report stated that D.F.'s cognitive functioning was "within the low average range of nonverbal cognitive ability[,] . . . fluid reasoning, memory, and processing speed" and he was "able to formulate sentences up to five words in length."  He was bilingual in English and Spanish and was in special education classes.

D.F. testified he could not read.  He graduated from high school.  He was employed at a nursery.  He was confused about a minute order regarding his appearance as a witness.  He explained that immunity meant "I don't get incriminated if I

speak in court." He paused before answering some questions on the stand.

The trial court denied defense counsel's request to appoint an expert to examine D.F.'s competence. The court found him competent to testify. The court noted that there "may be language barrier gaps" through the interpreter, that difficulty in remembering events three years earlier was not unusual, and with the exception of one nonsensical answer, the witness answered questions to the extent he could recall.

D.F. testified that his "complete understanding" of the oath was "[t]o testify" and to say "[h]ow everything happened, how the story happened." He testified that he was "here today to tell . . . what happened." He stated several times that he was telling the truth.

The law presumes that every person is qualified to be a witness. (Evid. Code, § 700.) "A person is disqualified to be a witness if he or she is: [¶] (1) Incapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him; or [¶] (2) Incapable of understanding the duty of a witness to tell the truth." (Evid. Code, § 701, subd. (a).) We review a trial court's determination of competence for abuse of discretion. (*People v. Flinner* (2020) 10 Cal.5th 686, 740 (*Flinner*).)

In *People v. Lewis* (2001) 26 Cal.4th 334, 360-361, the court found no basis to conclude that a witness was incompetent, even though he had "the intellect of a seven year old, he expressed difficulty with complex questions and often responded in incomplete, sometimes nonsensical, sentences." (*Id.* at p. 361.) The contention that his testimony was "unbelievable . . . was an issue of credibility for the jury and not relevant to the issue of

[his] competency." (*Ibid.*)

The record here shows that D.F. was capable of communicating. Inconsistent statements do not render a witness incompetent. (*Flinner*, *supra*, 10 Cal.5th at p. 742.) "[T]he deficiencies in [D.F.'s] capabilities as a witness [were not] hidden from the jury, which was given an 'ample basis upon which to judge the reliability of [his] observations.'" (*Ibid.*)

The record also shows that D.F. understood his duty to tell the truth. D.F. responded affirmatively to the oath to tell the truth. He testified that his testimony was true. He demonstrated that he knew the difference between the truth and a lie by admitting that he did not tell detectives the truth at first but later did so. The trial court did not abuse its discretion in allowing D.F. to testify.

### Ineffective assistance of counsel

Diaz contends that his trial counsel rendered ineffective assistance when he failed to properly challenge D.F.'s competence to testify. We are not persuaded.

Incompetence of counsel requires: (1) that counsel's performance was deficient, i.e., "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance" (*Strickland v. Washington* (1984) 466 U.S. 668, 690), and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at p. 694). Neither prong has been shown here.

Diaz's sole claim of ineffective assistance is that counsel failed to ask D.F. if he understood the difference between truth and a lie. Counsel would have a tactical reason to not ask the question because the answer might be that the witness knew

8

the difference. "[T]he manner of cross-examination [is] within counsel's discretion and rarely implicate[s] ineffective assistance of counsel." (*People v. McDermott* (2002) 28 Cal.4th 946, 993.)

Counsel challenged D.F.'s competence. He asked that an expert evaluate D.F. He cross-examined D.F. about his "cognitive disabilities," problems processing verbal statements, and "putting sentences together." He asked the witness to explain his understanding of the immunity agreement and of his oath as a witness. He moved to strike the testimony and attacked its credibility in closing argument. Diaz has not shown that counsel's performance was deficient or that, absent any deficiencies, a different result was reasonably probable.

### Multiple punishment

Diaz contends that sentences for kidnapping and criminal threats are barred by section 654 and must be stayed. He is incorrect.

"An act or omission that is punishable in different ways by different provisions of law" shall not "be punished under more than one provision." (§ 654, subd. (a).) A defendant may not be punished more than once for a "a single physical act," which "depends on whether some action . . . separately completes the actus reus for each of the relevant criminal offenses." (*People v. Corpening* (2016) 2 Cal.5th 307, 313 (*Corpening*).) When the facts are undisputed, the application of section 654 is a question of law we review de novo. (*Corpening*, at p. 312.) Any factual findings underlying the trial court's ruling are reviewed for substantial evidence. (*People v. Washington* (2021) 61 Cal.App.5th 776, 795.)

The trial court found the attempted murder and kidnapping were separate acts not subject to section 654. After

9

Diaz stabbed J.P, the kidnapping continued as Diaz kept driving, presumably towards the nursery.  (See *People v. Burney* (2009) 47 Cal.4th 203, 233-234 [kidnapping continues while victim remains detained].)

A "course of conduct" consisting of more than one act may result in multiple punishment if it reflects "multiple intents and objectives."  (*Corpening, supra*, 2 Cal.5th at p. 311.)  We review for substantial evidence whether section 654 is factually applicable to a series of offenses.  (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113.)

"[C]riminal acts committed pursuant to independent multiple objectives may be punished separately even if they share common acts or are part of an indivisible course of conduct." (*People v. Surdi* (1995) 35 Cal.App.4th 685, 689 [punishment for kidnapping and mayhem not barred by § 654].)  Here, substantial evidence supports multiple objectives:  to take J.P. to the nursery so Diaz and another individual could "have fun" using her for sex; and to kill J.P.  Multiple punishment was also permitted because the kidnapping continued after the stabbing and the acts "were separated by periods of time during which reflection was possible."  (*Surdi*, at p. 689.)  Section 654 therefore did not bar punishment for both attempted murder and kidnapping.

Nor did section 654 bar multiple punishment for criminal threats.  This case is like *People v. Solis* (2001) 90 Cal.App.4th 1002, 1022, which held that section 654 did not bar consecutive sentences for making threats to kill the victims and the arson of their apartment an hour later.  Threats are "a crime of psychic violence" separate from the physical violence inflicted. (*Solis*, at p. 1024.)  Threats may be separately punished from physical abuse even if they are intended to keep the victim from

10

fleeing the abuse. (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1046-1047.)

Separate enhancements were likewise properly imposed for the great bodily injury enhancements because they were based on infliction of different injuries. The jury found the enhancement for attempted murder based on stab wounds and a collapsed lung, and for kidnapping based on road rash and head injuries.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.


TANGEMAN, J.


We concur:



YEGAN, Acting P. J.



PERREN, J.

11

Anthony J. Sabo, Judge

Superior Court County of Ventura

_____

Darden Law Group and Christopher A. Darden for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.