Filed 3/27/26  P. v. Shahen CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>VACHO SHAHEN,<br><br>        Defendant and Appellant. | B339337<br><br>(Los Angeles County<br>Super. Ct. No. SA098412) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

        Paul Stubb, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Vacho Shahen appeals from a judgment entered after a jury found him guilty of three counts of first degree residential robbery with a person present, four counts of first degree residential burglary with a person present, five counts of false imprisonment by violence or menace, and three counts of assault with a firearm. As to all counts, the jury found the allegation that he used a firearm during commission of the offenses to be true. With respect to one of the counts of assault with a firearm, the jury found the allegation that he inflicted great bodily injury on the victim to be true. He committed these offenses over a two-week period during which he burglarized four homes. The court sentenced him to an aggregate prison term of 46 years and eight months in prison.

On appeal, he raises one claim of sentencing error. He contends the trial court violated Penal Code[1] section 654 when it declined to stay punishment on four of the five false imprisonment counts. He asserts the evidence was insufficient to show that when he falsely imprisoned each of these victims, he harbored a separate criminal objective that was not incidental to the robbery or burglary. We reject his contention and affirm.

## BACKGROUND

A. **Evidence Presented at Trial**[2]

1. ***Crimes against Victoria Papazian***

Victoria Papazian lived with her family in a three-bedroom house in Downey. At around 9:00 a.m., on August 15, 2016, she

---

[1] Undesignated statutory references are to the Penal Code.

[2] We include here evidence pertinent to the issue before us—whether the trial court complied with section 654 when it imposed and declined to stay punishment on four of the five false

2

was asleep in a bedroom and a noise woke her.  She had been alone in the house.  When she opened her eyes, she saw a man, later identified as Shahen, wearing all black clothing and a "very scary mask" like that worn in the movie "Scream," and pointing a gun at her face.  He said, " 'I'm not going to hurt you.  Don't make a sound.' "  Then, he placed handcuffs on her wrists.

He told her he needed money, and she took him to her purse in the living room which contained $10,000 in cash.  All the while he pointed the gun at her.  He took the money and said he needed $30,000.  She responded that she did not have that much money and offered to give him a $30,000 Cartier watch.  She took him back to the bedroom where she had been sleeping, and he grabbed the watch.  Next, he demanded the box that went with the watch, and she took him to a closet in a different bedroom where she stored the box.  He had her sit on the ground and he pointed the gun at her while he filled a shopping bag with valuables from the closet, including other watches, necklaces, rings, bracelets, antique gold coins, a collection of Dupont lighters, and her fiancé's gun.

After taking the various items, he led her to the kitchen.  He removed another set of handcuffs from his pocket and handcuffed her to the stove.  Thus, she was then wearing two sets of handcuffs: one set binding both wrists and another binding one of her wrists to the stove.  She pleaded with him to remove the handcuffs or place a phone near her, explaining, " 'No one is going to be coming home for a while.' "  He refused, saying, " 'I can't risk that,' " and " 'I'm sorry.  I can't do that.' "  Eventually, he

imprisonment counts.  We do not include a summary of all evidence supporting the jury's verdicts, such as evidence identifying Shahen as the perpetrator of the crimes.

3

agreed to remove the set of handcuffs binding her wrists together, and he left her with one wrist handcuffed to the stove. Papazian estimated that Shahen was in her home for approximately one hour.

After he left, she remained handcuffed for around 10 minutes. At first, she yelled for help, but no one came. Then, she managed to secure a knife from a drawer and used it to break one of the handcuffs. Once free, she dialed 9-1-1.

Based on these events, the jury found Shahen guilty of first degree burglary (§ 459) with a person present (count 1), first degree robbery (§ 211) with a person present (count 2), and false imprisonment (§ 236) by violence or menace (count 3). As to these counts, the jury found the allegation that Shahen personally used a firearm during commission of the offenses to be true. (§ 12022.53, subd. (b), as to the robbery; § 12022.5, subd. (a), as to the other offenses.)

### 2. *Crimes against Edna Perez and Frank Granadeno*

On August 16, 2016, the day after Shahen committed the crimes against Papazian, he burglarized another single-family home in Downey where Edna Perez was staying with her friend and her friend's adult son, Frank Granadeno.

At around 9:30 a.m., Perez walked out the front door of the house to take out some trash, and a man later identified as Shahen confronted her. He was dressed in all black and wore a mask like the one in the movie "Scream." He pushed her back inside the house, hit her on the shoulder with the butt of a gun, and she fell. He pointed the gun at her while she was on the floor. She asked him not to kill her and told him she had no

4

money.  She stood up and he handcuffed one of her wrists to a metal pole or railing at the bottom of a staircase.

Shahen climbed the stairs to the second floor, and Perez heard Granadeno scream.  She looked up and saw Shahen leading Granadeno from room to room, pointing the gun at the back of Granadeno's head.  On more than one occasion, Shahen brought Granadeno downstairs and led him to the garage at gunpoint.  Each time, they returned with tools, including a hammer and a tire iron, and went back upstairs.  Perez heard the sound of tools striking something.  The noise lasted more than two hours.  When Shahen finished upstairs, the safe in the master bedroom closet was open.

Shahen brought Granadeno downstairs and handcuffed him to the railing of the staircase next to Perez, using a separate set of handcuffs.  He continued to threaten them with the gun, at one point rubbing the gun against Perez's body.

Shahen walked through the kitchen, grabbed a set of car keys, and went to the garage.  Perez heard the Maserati that was parked there start up.  Shahen could not drive the Maserati out of the garage because there was another car in the driveway blocking the garage.  Perez heard the Maserati turn off.

Shahen came back into the house.  He gave Perez and Granadeno a water bottle and some bananas.  Then, he left through the front door.  Perez estimated that the whole event lasted two and a half to three hours.  She did not see Shahen take anything from the house.

After Shahen left, Perez and Granadeno remained handcuffed for 30 to 60 minutes.  Granadeno used his foot to turn the handle of the front door and open it.  He and Perez screamed for help.  A neighbor heard them yelling and came and freed

5

them from the handcuffs, using a key Shahen had left in the house.  Officers were called to the home.

Based on these events, the jury found Shahen guilty of one count of first degree burglary with a person present against Granadeno (count 4) and two counts of false imprisonment by violence or menace (count 6 against Granadeno and count 8 against Perez).[3]  As to these counts, the jury found the allegation that Shahen personally used a firearm during commission of the offenses to be true.  (§ 12022.5, subd. (a).)

### 3. *Crimes against Sanford Brotman and Yency Angulo*

On August 26, 2016, at around 5:10 a.m., Yency Angulo awoke and discovered water entering through a glass door at the Beverly Hills home of her boyfriend, Sanford Brotman.  She and Brotman went outside to investigate and found a garden hose jammed with wooden sticks, aimed at the house and spraying water on the door.  As they tried to figure out how this had occurred, a man later identified as Shahen jumped out from behind some bushes and pointed a gun at them.  He wore all black clothing and a "Scream" movie mask.

Shahen told them, " 'Get in the house.  Do as I say,' " or words to that effect.  He walked them into the house at gunpoint and ordered them to be quiet.  Once inside, he handcuffed one of Brotman's wrists to one of Angulo's wrists.  He said he would not hurt them if they followed his orders.  He ordered Brotman to walk him around the house, showing him where any safes and money were located.  Brotman complied and they walked through

---

[3] Count 8 is the sole false imprisonment count for which Shahen does not challenge his sentence.

every room.  From a safe, Shahen took a watch and cash totaling less than $1,000.  He also took $200 from Angulo's wallet.

When Shahen finished going through their things, he brought them to the kitchen.  He took their cell phones and removed the handcuffs.  According to Brotman's trial testimony, Shahen threatened them as follows:  "He told us that he's not going to tie us up and to sit in the kitchen and wait while he leaves.  He made a threat that -- I remember specifically that he knows where we live.  Don't call the police.  If he turns around and sees us get up -- because he wanted us to stay put because he's going to wait and see -- he's going to sho[o]t us through the window.  That's what he said."  Angulo testified:  "He told us to wait for 15 minutes before we were to call the police.  He said he knows what our faces look like.  He knows where we live.  He knows what cars we drive.  And that if he were to see us on the street he could shoot us if we were to call the police before."  According to Angulo, Shahen also "said that he was going to wait outside for a while to see if we were to call the police."

Shahen left, taking the handcuffs with him.  The ordeal lasted between an hour and an hour and a half.  Brotman told Angulo, " 'Let's not move.  Let's just sit here for a few minutes.' "  After some period of time, they got up and dialed 9-1-1.

Based on these events, the jury found Shahen guilty of one count of first degree burglary with a person present against Brotman (count 9), two counts of first degree robbery with a person present (count 10 against Brotman and count 11 against Angulo), and two counts of false imprisonment by violence or menace (count 14 against Brotman and count 15 against Angulo).  As to these counts, the jury found the allegation that Shahen personally used a firearm during commission of the offenses to be

true.  (§ 12022.53, subd. (b), as to the robberies; § 12022.5, subd. (a), as to the other offenses.)

### 4. *Other crimes*

On August 28, 2016, Shahen committed crimes against three other victims at a home in Santa Monica.  He shot one of the victims in the abdomen.  Based on this incident, the jury found Shahen guilty of one count of first degree burglary with a person present (count 16) and three counts of assault with a firearm (counts 20, 22 & 23).  As to these counts, the jury found the allegation that Shahen personally used a firearm during commission of the offenses to be true.  (§ 12022.5, subd. (a).)  As to one count of assault with a firearm (count 22), the jury found the allegation that Shahen inflicted great bodily injury on the victim to be true.  (§ 12022.7, subd. (a).)  We need not elaborate on the circumstances of these other crimes because they are not relevant to the issue Shahen raises in this appeal.

## B. Sentencing

The prosecution filed a sentencing memorandum recommending, among other things, that the court impose and stay punishment under section 654 for the burglary against Papazian (count 1) and the burglary against Brotman (count 9) because these offenses were part of the same course of conduct as the robberies committed against the same victims (counts 2 & 10).  The prosecution also recommended that the court impose and stay punishment for three of the five false imprisonment counts, count 3 against Papazian, count 14 against Brotman, and count 15 against Angulo, arguing these offenses were incidental to and indivisible from the robberies committed against the same victims.  As to the false imprisonment count against Granadeno

8

(count 6), the prosecution asserted it was "unclear" if the offense "would be subject to [section] 654" but recommended the court impose and stay punishment "for the sake of avoiding error."[4]  As to all other counts, the prosecution urged the court to impose consecutive terms.

At the sentencing hearing, the court addressed the prosecution's recommendations, agreeing it was appropriate to impose and stay punishment under section 654 for the burglaries in counts 1 and 9.  The court disagreed with the prosecution's section 654 analysis as to the false imprisonment counts, stating:

"[T]his is where the People and I diverge on thoughts on this -- the various false imprisonment charges in this case reflect the gratuitous violence and stress of the victims above and beyond that which is necessary for either the burglaries or the robberies.

"I'll note that in the Brotman matter and Angulo matter [counts 14 & 15], the defendant moved the victims from place to place at gunpoint.  And in the other matters -- two of the other matters [counts 3 & 6] -- he handcuffed the victims in such a way that it precluded them from seeking assistance or summoning help.

"And I think that the violence reflected in those false imprisonments goes far beyond that which you normally see in a home invasion robbery or a residential burglary or a burglary with a person present.

---

[4] A section 654 analysis is not applicable to the remaining false imprisonment count against Perez (count 8), as Shahen was not charged with any other crime against her, such as robbery.

9

"And, therefore, because of the violence and the additional violence, I think that . . . section 654 does not apply to those false imprisonment cases."

The court selected count 2, the robbery committed against Papazian, as the principal term, and imposed the middle term for the offense plus the statutory term for the firearm enhancement under section 12022.53, subdivision (b).  On all other counts, except counts 1 and 9 which were stayed, the court imposed consecutive terms of one-third the middle term for the offense plus one-third the statutory term or one-third the middle term for the enhancements applicable to the count.  The aggregate prison sentence, as imposed and executed, is 46 years and eight months.

The term imposed for each false imprisonment count that Shahen challenges on appeal (counts 3, 6, 14 & 15) is two years: one-third the middle term for the offense (eight months) plus one-third the middle term for the firearm enhancement under section 12022.5, subdivision (a) (one year and four months).  Shahen asks us to order that these terms be stayed, thereby reducing his executed sentence by eight years.

## DISCUSSION

Shahen contends the trial court violated section 654 when it declined to stay punishment on four of the five counts of false imprisonment.  He asserts the evidence was insufficient to show that when he falsely imprisoned each of these victims he harbored a separate criminal objective that was *not* incidental to the robbery or burglary.  We reject Shahen's contention, as substantial evidence supports the factual findings underpinning the court's decision to impose punishment on each false imprisonment count.

10

### 1.  *Elements of the offenses at issue*

In determining whether the court could impose (and decline to stay) multiple punishments for robbery or burglary on the one hand, and false imprisonment of the same victim on the other hand, we begin with the elements of each offense.

As the trial court instructed the jury, the elements of robbery in violation of section 211 are:  "1.  The defendant took property that was not his own;  [¶]  2.  The property was in the possession of another person;  [¶]  3.  The property was taken from the other person or his or her immediate presence;  [¶]  4. The property was taken against that person's will;  [¶]  5.  The defendant used force or fear to take the property or to prevent the person from resisting;  [¶]  AND  [¶]  6.  When the defendant used force or fear, he intended to deprive the owner of the property permanently or to remove the property from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property."  (CALCRIM No. 1600.)

The elements of burglary in violation of section 459, as applicable to the facts of this case, are:  "1.  The defendant entered a building, room within a building, or structure;  [¶] AND  [¶]  2.  When he entered the building, room, or structure, he intended to commit theft."  (CALCRIM No. 1700.)

Finally, the elements of false imprisonment by violence or menace in violation of section 236 are:  "1.  The defendant intentionally and unlawfully restrained, or confined, or detained someone by violence or menace;  [¶]  AND  [¶]  2.  The defendant made the other person stay or go somewhere against that person's will.  *Violence* means using physical force that is greater than the force reasonably necessary to restrain someone.  [¶]

11

*Menace* means a verbal or physical threat of harm, including use of a deadly weapon." (CALCRIM No. 1240.)

### 2. *Applicable legal principles regarding section 654*

Section 654, subdivision (a), provides in pertinent part, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." Thus, "If a single action or course of conduct by a defendant violates multiple laws, 'the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, [but] the trial court may impose sentence for only one offense' " and must stay the sentence for the others. (*People v. Sek* (2022) 74 Cal.App.5th 657, 673; *People v. Deloza* (1998) 18 Cal.4th 585, 591-592.)

Section 654's purpose is to ensure a defendant is punished in a manner commensurate with culpability. (*People v. Harrison* (1989) 48 Cal.3d 321, 335; *People v. Gaynor* (2019) 42 Cal.App.5th 794, 800.) To that end, it "precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) Whether a course of criminal conduct is divisible depends on the intent and objective of the actor. (*People v. Jackson* (2016) 1 Cal.5th 269, 354.) If a "defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he [or she] may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*Harrison*, at p. 335.) Multiple punishments are also permissible where a course of criminal conduct is divisible in time

12

and " 'the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken' " and creating a " 'new risk of harm.' " (*Gaynor*, at pp. 800, 804; *People v. Peyton* (2014) 229 Cal.App.4th 1063, 1080.)

"Section 654 'cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense.' " (*People v. Vasquez* (2020) 44 Cal.App.5th 732, 737 (*Vasquez*).) "[A]t some point the means to achieve an objective may become so extreme they can no longer be termed 'incidental' and must be considered to express a different and a more sinister goal than mere successful commission of the original crime." (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 191.) For example, "gratuitous violence against a helpless and unresisting victim . . . has traditionally been viewed as not 'incidental' to robbery for purposes of . . . section 654." (*Id.* at p. 190.)

### 3. *Standard of review*

"The question of whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination." (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113; *Vasquez, supra,* 44 Cal.App.5th at p. 737.) Generally, "a trial court may base its decision under section 654 on any of the facts that are in evidence at trial," even those that may not have been the basis for the jury's verdicts. (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340, italics omitted.) We review the trial court's express or implied findings regarding the defendant's intent and objective under the substantial evidence

13

standard of review.  (*Vasquez,* at p. 737.)  To that end, we "review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence."  (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

### 4. *Analysis*

With respect to count 3 (Papazian), count 6 (Granadeno), count 14 (Brotman), and count 15 (Angulo), substantial evidence supports the factual finding that the false imprisonment was not incidental to the robbery or burglary.  Therefore, section 654 does not bar separate punishment.

### a. *Papazian and Granadeno*

As to Papazian and Granadeno, substantial evidence presented at trial shows:  Neither had resisted as Shahen trained a firearm on them and searched their homes for loot.  Thereafter, he immobilized them by handcuffing them to household fixtures. Papazian begged him not to leave her handcuffed to the stove, explaining that no one would be home for a while to help her free herself.  Shahen provided Granadeno with water and bananas before he left him handcuffed to the staircase—an indication Shahen intended that Granadeno be restrained long after Shahen left the area.  Handcuffing Papazian and Granadeno in this fashion created a new risk of harm, separate and apart from the robbery or burglary, and demonstrated a divisible course of conduct that was separately punishable.

*People v. Foster* (1988) 201 Cal.App.3d 20 is instructive here.  There, two men robbed a convenience store, one armed with a knife and the other armed with a tire iron.  "After they obtained the money, they locked two employees and a bystander in the store's cooler [citation to record].  After [the perpetrators]

14

left, the victims escaped from the cooler through the soda pop display case." (*Id*. at p. 23.) The Court of Appeal rejected the appellant's contention "that the false imprisonment of the three victims was merely incidental to the robbery, and that therefore Penal Code section 654 require[d] that the execution of sentence on each of the false imprisonment counts be stayed." (*Id*. at p. 27.) The appellate court reasoned: "The imprisonment of the victims occurred *after* the robbers had obtained all of the money, and therefore was not necessary or incidental to committing the robbery. Locking the victims in the store cooler was potentially dangerous to their safety and health. It is analogous to a needless or vicious assault committed after a robbery, which has long been held separately punishable and distinguishable from an assault which is merely incidental to robbery." (*Id*. at pp. 27-28.)

Shahen argues the analysis in *Foster* is inapplicable, asserting that there the victims were gratuitously "imprisoned under dangerous conditions" after the robbers had obtained the money, while here "the false imprisonment was inexorably tied to the robbery or burglary by neutralizing any potential resistance by the victims and to facilitate escape without detection or infliction of any traumatic physical injury or great bodily injury or death." (Italics omitted.) We disagree. Papazian and Granadeno were not resisting when Shahen made the decision to handcuff them to household fixtures. He had achieved their submission by training a firearm on them during the entire duration of the robbery (Papazian) or burglary (Granadeno). Handcuffing them in this manner before he left, ensuring they would remain restrained after he already obtained all he would steal, created new and different risks of harm, both psychological

15

and physical, just like in *Foster*. Section 654 does not bar multiple punishments for this divisible course of conduct. Imposing and declining to stay punishment for these false imprisonment counts ensures that Shahen is punished in a manner commensurate with his culpability, consistent with the purpose of section 654.

### b.    *Brotman and Angulo*

In his section 654 analysis in his appellate briefing, Shahen describes the false imprisonment of Brotman and Angulo as follows: They "had the handcuffs removed and were told to wait before calling for law enforcement." His analysis omits key facts. Evidence presented at trial demonstrates that Shahen threatened to wait outside and shoot Brotman and Angulo through the window if he saw them stand up or call the police. He also threatened to return to their home or confront them out on the street and shoot them if he discovered later that they did not wait 15 minutes before getting up and calling the police.

Based on these facts, we have no cause to disturb the trial court's imposition of multiple punishments for the robberies and false imprisonments. The additional terror Shahen inflicted on Brotman and Angulo after he obtained their money, by threatening to lie in wait and shoot them and by emphasizing he knew what they looked like and where they lived, was gratuitous and not incidental to the robberies (or necessary for his escape to a place of temporary safety). (See *In re Jesse F.* (1982) 137 Cal.App.3d 164, 171 [although the "crime of robbery is not actually complete until the robber 'has won his way to a place of temporary safety,' " this "cannot mean every act a robber commits before making his getaway is incidental to the robbery"].) The

16

trial court did not violate section 654 in imposing separate punishment for this divisible course of criminal conduct.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.

17